## 29997. SANDERS v. THE STATE.

PER CURIAM.

Appellant David Sanders was indicted on July 31, 1973, for the murder of Sheila Hunnicutt, the wife of his employer. The case was tried before a jury, resulting in a verdict of guilty, and appellant was sentenced to a life imprisonment term on August 17, 1973. The trial court overruled a motion for new trial and this appeal followed in due course, enumerating several errors.

Appellant's contentions are that the trial court erred in overruling his challenge to the array of jurors; erred in overruling his motion to suppress certain physical evidence and erred in admitting such evidence at trial; erred in admitting into evidence the sheriff's testimony about an incriminating statement made to him by the appellant while in custody; erred in admitting opinion testimony by the sheriff as an expert; and, erred in overruling the motion for new trial.

### I. Challenge to the Array

Prior to trial appellant filed a "Motion to Quash Indictments and Challenge to the Array of Grand and Traverse Jurors," alleging that blacks, women and especially black women were purposefully and systematically excluded from the grand and traverse jury lists, resulting in a violation of the due process and equal protection clauses of the United States and Georgia Constitutions. After hearing evidence the trial court overruled the motion.

Appellant's motion to quash the indictment and challenge to the array of the grand jurors was not timely filed. In order for such a motion to be entertained by the trial court, it must be made prior to the return of the

indictment or the defendant must show that he had no knowledge, either actual or constructive, of such alleged illegal composition of the grand jury prior to the time the indictment was returned; otherwise, the objection is deemed to be waived. *Estes v. State,* 232 Ga. 703, 708 (208 SE2d 806) (1974). Accord, *McHan v. State,* 232 Ga. 470, 471 (2) (207 SE2d 457) (1974); *Simmons v. State,* 226 Ga. 110, 111 (172 SE2d 680) (1970); *Williams v. State,* 210 Ga. 665, 667 (82 SE2d 217) (1954). No such showing was made in this case, and it is clear that the motion, which was filed on August 6, 1973, was filed subsequent to the return of the indictment, which occurred on July 31, 1973. Furthermore, the evidence discloses that appellant was appointed an attorney on July 9, 1973. On the basis of *Estes, McHan* and *Simmons,* therefore, the ruling of the trial court denying appellant's motion to quash the indictment and challenge to the array of grand jurors must be affirmed on its face. Appellant's challenge to the array of the traverse jury, however, was timely filed and will be considered on its merits.

Appellant alleged in his motion that according to the 1970 federal census there are 6,249 persons living in Monroe County who are 21 years of age, or older. Of this group, 60 percent are white; 40 percent are black; 44 percent are male; 56 percent are female; and 22 percent are black females. Appellant averred that the traverse jury list was composed of 735 names of which 20 percent were black; 12 percent were females and 3 percent were black females.

The evidence adduced at the hearings on the motion established that the latest jury list revision prior to the trial occurred in April, 1972, and that the jury commission was then composed of three women, one of whom was black, and three men, one of whom was black. In addition, the clerk of the commission, who was present at all times during the selection process, was also a woman. The testimony of the commissioners, describing the method they used for compiling the jury list, was similar on all material points. The basic source of names for the jury list was the official registered voters' list of the county. The commissioners, as a group, reviewed every name on the list to determine whether each individual

thereon was qualified to serve on the jury list pursuant to Code Ann. § 59-106. In those instances where only one commissioner was familiar with an individual, the other commissioners generally would defer to that commissioner's estimation of the individual's qualifications.

When none of the commissioners was familiar with an individual whose name appeared on the voters' list, that person's name was placed on a separate list and a commissioner was selected to investigate that person's qualifications for jury duty. A separate list was also made of women with young children who had not requested in writing to be exempted from jury service. Those women were then contacted to determine if they desired to have their names placed on the jury list.

In addition, the commissioners placed upon the traverse jury list persons whose names did not appear on the voters' list. The names of such people came to the attention of the commission either as the result of a person contacting the commission or an individual commissioner and requesting that his or her name be placed on the jury list, or as the result of a commissioner proposing the name of a person with whom he was acquainted and who he knew was not on the voters' list.

All of the commissioners, including the women and black commissioners, made an effort to go into the community in order to find people who were qualified for jury service but who did not appear on the voters' list. The evidence shows that both black and white commissioners proposed the names of blacks for inclusion on the jury list. All persons, who were not listed on the voters' list but who were proposed for inclusion on the jury list, were subjected to the same qualifications review as that accorded to persons who did appear on the voters' list. The testimony of one commissioner indicates that approximately 200 names were added to the jury list in this manner.

The clerk of the commission and all of the commissioners including the black and woman commissioners testified that no particular mention was made of the race or sex of an individual during the selection process and that no one was excluded from the jury list because of his or her race or sex. They all testified

that in their opinion the final jury list represented a fair cross-section of the county. However, they all also testified that they did not know, nor was a calculation ever made, of the number or proportions of blacks, whites, males, females, and black females on the voter list or the final traverse jury list.

The only evidence of the actual composition of the final traverse jury list is the testimony elicited from Mr. Paul James, a black jury commissioner. The list itself was not introduced into evidence. After reviewing the traverse jury list, Mr. James identified 163 persons, of the 735 appearing on the list, as being black and he further identified 30 of the 163 black persons as being black females. Mr. James also testified that although he was familiar with the black community, he may not have identified the names of all the blacks who were on the jury list.

Although appellant contended in the trial court and contends on appeal that females as a class were purposefully excluded from the traverse jury list, stating in his brief in this court that "[a] review of [the traverse jury list], identifying females by their names, revealed that of the 735 names appearing on the traverse jury list, only 90 (or 12%) were females," nevertheless, these allegations are not supported in the record by any evidence or stipulation. Indeed, there is no evidence in the record regarding the number or percentage of females on the traverse jury list. This deficiency in the evidence is fatal to appellant's claim that females as a class were the subject of discrimination in the jury selection procedures, for the burden was upon him to demonstrate that such discrimination occurred. Swain v. Alabama, 380 U. S. 202, 205 (1965). Appellant has, consequently, failed to establish that females as a class are not adequately represented on the traverse jury list.

Appellant also introduced into evidence a statistical abstract of the official registered voters' list for Monroe County, current through July 11, 1973. According to the abstract there is a total of 5,894 registered voters in the county, 517 (8.77 percent) of which are unidentified as to race or sex. Of the remaining 5,377 voters, 34.666 percent are black and 18.932 percent are black females. This

information was obtained from voter registration cards kept on file by the county. The voters list itself, which is the only document relating to voters used by the jury commissioners, lists only names, unidentified as to address, race or sex.

A defendant is not constitutionally entitled to a venire or jury roll of any particular composition, but the 14th Amendment Equal Protection and Due Process Clause and the 6th Amendment Right to a Jury Trial do require that the state not deliberately and systematically exclude identifiable and distinct groups from their jury lists. Taylor v. Louisiana, 419 U. S. 522 (95 SC 692, 42 LE2d 690) (1975); Peters v. Kiff, 407 U. S. 493 (1972); Alexander v. Louisiana, 405 U. S. 625, 628 (1972); Swain v. Alabama, 380 U. S. 202, 208, supra; Hernandez v. Texas, 347 U. S. 475, 478 (1954). The burden, however, is on the defendant to prove such purposeful discrimination. Whitus v. Georgia, 385 U. S. 545, 550 (1967); Tarrance v. Florida, 188 U. S. 519 (1903).

Appellant presented no evidence regarding the composition of any traverse jury list prior to the one from which the jury chosen to try him was selected. Consequently, the so-called "rule of exclusion" cases, exemplified by Patton v. Mississippi, 332 U. S. 463 (1947); Pierre v. Louisiana, 306 U. S. 354 (1939); and Norris v. Alabama, 294 U. S. 587 (1935), are not applicable. Rather, appellant sought to establish that the jury list, from which his jury was to be chosen, was compiled in an unconstitutional manner, apparently basing his claim on such cases as Alexander v. Louisiana, supra, and Whitus v. Georgia, supra, which held that statistical evidence establishing that blacks were underrepresented, together with evidence that the selection procedures were not racially neutral, established a prima facie case of invidious racial discrimination thus shifting the burden of proof to the state.

Appellant contends that the evidence made out such a prima facie case of discrimination and the state failed to rebut his prima facie case. A threshold question raised by appellant's challenge to the array is whether black females constitute an identifiable and distinct class for purposes of a jury challenge based on the 14th

Amendment. Of course, a defendant may now complain of the exclusion from the jury of a distinct class to which he does not belong. Peters v. Kiff, 407 U. S. 493, supra. However, appellant introduced no evidence which would tend to show that black females are considered a separate class in the community distinct from blacks or other females. Therefore, appellant's failure to prove this factual predicate for a finding of distinctness is fatal to his claim of unconstitutional discrimination against black females. See Hernandez v. Texas, 347 U. S. 475, supra. There remains, however, the question of discrimination against blacks as a group.

In order to establish a prima facie case of discrimination, the defendant must demonstrate that there exists a substantial disparity between the proportion of blacks chosen for jury duty and the proportion of blacks in the eligible population and that the selection procedures themselves are not racially neutral. See Alexander v. Louisiana, 405 U. S. 625, 630, supra; and Turner v. Fouche, 396 U. S. 346, 360 (1970). In determining whether a particular discrepancy is substantial or significant, some allowance may be made for the imprecision of the jury selection process and the operation of constitutionally inoffensive factors such as exemptions from jury duty based on occupation. See Swain v. Alabama, 380 U. S. 202, 208, supra.

The evidence discloses that the figures relied upon by appellant to establish the discrepancy are imprecise. Only one person was called upon to identify blacks on the jury list. This witness was the black jury commissioner who testified that he may not have recognized the names of all of the blacks on the list. The evidence of underrepresentation is, therefore, inconclusive. This is especially true in light of the testimony of the two black jury commissioners that no person was excluded from the list because of his or her race. The evidence in this case does not present a persuasive basis for finding there was purposeful discrimination in making the jury list of Monroe County. Therefore, we affirm the trial court on this issue.

II. Motion to Suppress

During the trial the state introduced into evidence

appellant's palm and fingerprints, his rubber boots, his trousers, hairs removed from his body, and tires removed from his brother's car. Testimony adduced by the state disclosed that the murder occurred on the morning of July 6, 1973, between 7:21 and about 8:30 a.m.; that the victim had been raped; that appellant drove his brother's car that morning between approximately 6:30 and 8:00 a.m.; that tire tracks in the victim's driveway were similar in wear and tread design to tracks made by that automobile; that the tread of appellant's boots matched "cleats of mud" found in the victim's home; that appellant's palmprint matched a palmprint found on a table which was located next to the bed where the victim's body was discovered; and that several hairs found in the zipper of appellant's trousers matched the victim's pubic hairs. Appellant's pre-trial motion to suppress this physical evidence was denied by the trial court.

Appellant argues that these items of physical evidence (prints, boots, trousers, hair and tires) were obtained from him while he was being illegally detained by the police from July 6 to July 9, 1973, without a warrant. In particular, appellant contends that his warrantless arrest was illegal, because it was in violation of the Fourth Amendment in that it was not based upon probable cause, and also because it was in violation of Code §§ 27-207, 27-212. He also contends that the sheriff's testimony as to his incriminating statement was inadmissible.

The murder occurred on Friday morning, July 6, 1973, and appellant was taken into custody on that day. The warrant was issued on Monday, July 9, and appellant appeared before a magistrate on that day. A formal commitment hearing was held on July 19, the motion to suppress was heard August 8 and 9, and the trial commenced on August 15.

At the outset we should determine whether, in considering appellant's motion to suppress, we are limited to the pre-trial testimony adduced at the August 8-9 hearing on that motion, or may we also consider the July 19 commitment hearing testimony as well as any testimony adduced at trial pertinent to this inquiry. In Morales v. New York, 396 U. S. 102, 105 (90 SC 291, 24

LE2d 299) (1969), the case was remanded for evidentiary hearing to develop the circumstances leading to arrest. If testimony adduced at a post-conviction hearing can be utilized to show whether or not there was probable cause for arrest, then it follows that testimony adduced at a commitment hearing and at trial may be utilized for the same purpose. See also Brown v. Illinois, —— U. S. —— (95 SC 2254, 45 LE2d 416).

We therefore will consider the pre-trial testimony as supplemented by the trial transcript.

The evidence shows the following circumstances relative to appellant's arrest and detention. The victim's housekeeper arrived at work the morning of July 6 at about 8:30 and soon thereafter found the body. She telephoned a neighbor, Wallace Smarr, who, wearing slippers, went with his wife to the victim's home. He checked the victim's pulse and telephoned the sheriff's office. At 9:05 a.m., the sheriff received a telephone call informing him that there had been a murder at Johnny Hunnicutt's house. When he arrived at the Hunnicutt home at about 9:20 the sheriff met Wallace Hunnicutt (the victim's brother-in-law) and appellant David Sanders on the road at the end of the driveway. The sheriff (who had been in the tire business for 20 years) asked them to block the driveway in order to prevent tire tracks from being disturbed. Wallace Hunnicutt, David Sanders and also David's brother, Clarence Sanders, were employed on a dairy farm by the victim's husband, Johnny Hunnicutt.

The sheriff met the housekeeper and Mr. and Mrs. Smarr in the yard. He entered the house and found the victim's body, tied hand and foot with the telephone cord and a sash, on a bed in the bedroom at the back of the house. A .25 caliber pistol and a spent cartridge were located at the head of the bed. (The sheriff did not learn until that afternoon that the victim had been shot, the bullet entering her head up in the hairline.) The sheriff also noticed several "Z" shaped cleats of mud on the floors of the hallway, middle bedroom and back bedroom. A palmprint was discovered on the table next to the victim's bed. This evidence was sent to the crime lab in Atlanta.

The sheriff then went out to the driveway and began

examining the tire tracks. As heretofore noted, he had been in the tire business for 20 years and had been in the recapping business for 18 years. He testified that he was able to identify all the tracks but two in the driveway as being made either by the victim's car, her husband's pick-up truck, Wallace Hunnicutt's car, or Wallace Smarr's car. (He determined on the following day that one of the unidentified tracks was made by the car which brought the housekeeper.) As the sheriff was making a plaster cast of one unidentified tire track, a car drove down the dirt road in front of the Hunnicutt driveway and stopped nearby at Clarence Sanders' house. The sheriff noted that the tracks of that car matched unidentified tracks in the driveway. The sheriff spoke with Mrs. Clarence Sanders who had been driving her husband's car and learned that appellant had borrowed the car earlier that morning between about 6:30 and 8:00 a.m.

The sheriff talked to the victim's husband, Johnny Hunnicutt. He learned that three men owned rubber boots with treads capable of making the mud tracks found in the victim's home: appellant, Wallace Hunnicutt and Johnny Hunnicutt. All three men had been at the dairy barn, located not far from the victim's house, at some time in the early morning. Clarence Sanders, who wore a different type of boot, had also been working at the barn that morning. The sheriff learned that all four men were at the barn around 5:30 a.m., that Johnny Hunnicutt had only been at the barn for a few minutes before he left to work at the post office, and that both Wallace Hunnicutt and appellant had left the barn at various times. Appellant left the barn at about 6:00 a.m. to go get his brother's car, telling his brother that he was going for cigarettes. As heretofore noted, appellant had that car from about 6:30 to 8:00. Wallace Hunnicutt left the barn once shortly after 6:00 a.m. to go to his house to go to the bathroom. He was gone about 15 to 30 minutes. His mother confirmed that he came home on this occasion. He left again after 8:00 a.m. (after appellant returned) to go home for breakfast. His mother was not at home at this time. Mrs. Smarr saw Wallace Hunnicutt and Clarence Sanders at the barn at about 7:30. She fixed the calves milk, which took about 30 minutes, before she saw appellant.

Wallace Hunnicutt drove appellant to the victim's home about 9:00 a.m. En route, appellant told Wallace that during his absence from the barn he had gone to Hamm's store for cigarettes. Appellant did not enter the house at this time. Wallace, however, did.

During the day, the sheriff learned that the victim had received and accepted a collect telephone call at about 7:30 a.m. (It was learned the next day from the telephone company that the exact time of the call was 7:21 a.m. and that it lasted 47 seconds). The caller worked under the victim's supervision at the telephone company and was able to identify her voice. The caller told the victim her father had had a heart attack and she would not be at work.

At about 11:30 a.m., the sheriff sent his deputy to interview Clarence Sanders as to appellant's whereabouts earlier that morning and to take appellant to the sheriff's office for questioning. When asked whether he had some reason for this action the sheriff answered: "The mud on the floor inside the house, the tire tracks inside the driveway, and his absence from the dairy barn for an hour and a half period when Mrs. Hunnicutt had to have been killed." The sheriff testified further concerning the progress of the investigation as of 11:30 a.m. as follows: "Q. Now, is it not a fact, Sheriff, that you did not have a warrant for David Sanders' arrest at that time? A. No, sir. Q. As a matter of fact, you did not have sufficient evidence even to obtain an arrest warrant; isn't that true, at the time? A. I didn't feel like I did at that time."

Pursuant to the sheriff's instructions, Deputy Jack Pitts interviewed Clarence Sanders as to appellant's whereabouts earlier that day and took appellant to the sheriff's office for questioning. Upon delivering appellant to the office, the deputy went to Hamm's store to learn whether appellant had gone there that morning between 6:30 and 8:00 to buy cigarettes. He learned that appellant had not.

Appellant spent the afternoon and early evening at the sheriff's office, watching television in one of the downstairs rooms.

The sheriff was present at the funeral home when the autopsy was performed on the afternoon of July 6. He

learned the medical examiner's findings. Although appellant was at the sheriff's office, the sheriff testified that he was not in custody during this time. In fact the sheriff testified that before appellant was given Miranda warnings and questioned, he (the sheriff) "did not think that David Sanders had committed the crime" but "thought he could help me in the investigation of the case."

During the day the sheriff verified that the victim's husband had been at work at the post office that morning.

At the hearing on the motion to suppress, the sheriff testified that as of the evening of July 6, 1973, he suspected anybody who had rubber boots which would leave the tracks he had found and anybody who could have been at the scene of the crime at the time it was committed (between about 7:30 and 8:30 a.m. insofar as he then knew), namely the victim's husband (Johnny Hunnicutt), Wallace Hunnicutt and the appellant, except that he had determined that Johnny Hunnicutt was at work at the post office.

At about 8:30 p.m. appellant's brother, Clarence Sanders, was brought to the sheriff's office by Deputy Pitts. Clarence Sanders talked with his brother for 15 or 20 minutes. Then the sheriff asked Clarence who had driven his car that day and whether he (Clarence) had driven it in the victim's driveway. The sheriff previously had learned that Clarence Sanders' wife had not driven the car into the driveway. The sheriff also asked Clarence Sanders if he could identify a sash (the one used to tie the victim).

That evening, before the sheriff arrived at his office, Deputy Pitts read to appellant a document which contained the Miranda warnings and a waiver of counsel. Appellant placed his mark on it, notwithstanding the fact that the document stated that he could read and write. The sheriff had another copy of the document read to appellant, with the words "I can read and write the English language" crossed out. Appellant executed it with an "X."

After being given the Miranda warning and waiving his right to counsel, appellant told the sheriff that he had

gone to Hamm's store for cigarettes. When advised that this account had been found to be untrue, he said that he drove to town and rode around. The route he described was away from the victim's house. Upon request he tied knots which the sheriff recognized as being like the knots used to tie the victim.

The interrogation of appellant that Friday night lasted about an hour. After the interrogation, the sheriff took appellant's fingerprints. The sheriff testified that he did not remember having asked for appellant's permission to do so, but that appellant did not object to the procedure. At about the same time, the sheriff asked appellant for his boots and trousers. The fingerprints and the clothing were sent to the crime lab for examination.

The sheriff testified as follows: "Q. Now, isn't it a fact that at the time you took those clothes you had not had an arrest warrant? A. I did not have a warrant. Q. You did not have a search warrant? A. I did not have a search warrant. Q. And, isn't it a fact that you had not at that time felt that you had sufficient evidence to get an arrest warrant? A. I did not get an arrest warrant for him . . . I had mixed feelings about whether I had enough evidence at that time. I did not want to take out a warrant for him until I had heard from the evidence from the crime lab on the fingerprints and the gun and I had not heard from them at that time." The sheriff testified further: "Q. Is it not true, Sheriff, that on Friday until Monday you did not feel that you had sufficient evidence to get an arrest warrant? A. I didn't know whether I had enough evidence or not. I wanted to wait until I got the crime lab report."

· On the following Saturday, the sheriff learned from telephone company records that the victim had received the collect call at 7:21 a.m., Friday, and he interviewed the caller. He talked with appellant briefly on that day. He talked again with Clarence Sanders, asking him about Wallace Hunnicutt. Clarence Sanders talked with appellant on that Saturday and again on Sunday around noon.

On Sunday the sheriff told appellant about the tire tracks he had found. Appellant then told the sheriff he had driven by the victim's house on Friday morning, turning around in the driveway. Appellant was taken to

Macon Sunday evening for a polygraph test. The sheriff testified that he could not use the lie detector test to take out a warrant. Sometime that weekend, the sheriff learned that appellant's mother was undertaking to retain an attorney.

On Monday morning, July 9, the sheriff went to appellant's cell and asked appellant for samples of hair from his head and pubic area. Appellant complied without objection, plucking out the hair himself and placing it in a vial. The sheriff then took these specimens to the crime lab in Atlanta. While there the sheriff was told that appellant's prints matched the palmprint found on the table next to the victim's bed, and that several pubic hairs similar to the victim's were found in the zipper of appellant's trousers. The sheriff phoned his deputy and instructed him to obtain a warrant for appellant's arrest and to ask the judge to appoint counsel. At that time appellant had been in continuous custody since the previous Friday without being taken before a magistrate.

Upon arriving back at his office, the sheriff was informed by his deputy that a warrant had been obtained, that appellant had been before a magistrate, and that the judge had appointed appellant an attorney. The sheriff then went to appellant, told him that the warrant had been issued and that he had been appointed an attorney. He also told appellant that he could wait until the attorney came before he talked to him further but that he had something he wanted to tell appellant. The sheriff then informed appellant of the crime lab report regarding appellant's palmprint and the victim's pubic hair and asked appellant if he would like to make a statement. Appellant answered that he would, but the sheriff said that he would let him think about it and then left for about 15 minutes. When the sheriff returned, he again asked appellant if he would like to make a statement. Appellant said "Yes" and gave a statement to the sheriff incriminating himself in the crime.

Appellant said that he went to the victim's house about 6:45 a.m., that the victim came to the door and let him in, that he grabbed her, that they had intercourse, that the telephone rang, that he held her while she talked on the phone, that the call was somebody saying she

wouldn't be at work because her father was sick, that he tied the victim using the telephone cord to tie her hands and a sash removed from her closet to tie her feet and neck and that he left her in that position. Based on this statement, the sheriff was able to identify the dress from which the sash was taken.

At the hearing on the motion to supress, the sheriff was asked by defense counsel whether he told appellant about the crime lab report for the purpose of getting him to change his story and admit the crime. The sheriff replied: "[P]artially. I told him that if there was somebody else with him that I didn't want him to take the whole rap by himself, that I wanted him to tell me the truth, that we had this much evidence on him and if there was somebody else with him, I wanted to know it." Appellant did not implicate anyone else.

Appellant contends that he was arrested without probable cause and that his fingerprints, boots, trousers and hair, and the tires from his brother's car, should have been suppressed, as well as the sheriff's testimony as to appellant's incriminating statement. In support of this argument appellant argues both federal and state grounds. He relies heavily on the fact that he was arrested without a warrant, that he was held from Friday until Monday, and that the sheriff testified that he did not get a warrant until Monday because he was uncertain as to whether he had sufficient evidence to obtain one.

We must first determine at what point appellant was arrested, and then determine whether probable cause existed for his arrest at that time.

We conclude that the appellant was legally arrested without a warrant about 11:30 a.m. Friday, July 6, when the deputy sheriff, at the direction of the sheriff, took the appellant to the sheriff's office for questioning. At that time he was restrained of his liberty. Although the sheriff states he did not arrest the appellant until later he states he had his deputy take him into custody. The appellant never left the sheriff's office, he was given the Miranda warnings, was interrogated, fingerprinted, his clothing taken, and he was placed in a cell that evening. The sheriff did not order the appellant arrested under a warrant until Monday, July 9. It appears that the sheriff

equates an arrest with a formal arrest under a warrant. In fact the evidence supports the trial court's refusal to suppress the evidence seized because there was an arrest when the deputy sheriff took the appellant to the sheriff's office Friday morning, July 6. As stated in Terry v. Ohio, 392 U. S. 1, 16 (88 SC 1868, 20 LE2d 889) (1968), ". . . whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Also *Brisbane v. State*, 233 Ga. 339, 341 (211 SE2d 294) (1974).

The questions then are whether, at this time, 11:30 a.m. Friday, July 6, there was sufficient evidence to support a finding of probable cause and a finding that a failure of justice might occur for want of a warrant. In my opinion there was ample evidence to support both.

When the deputy sheriff took the appellant into custody the following facts were known: 1. The victim was probably alive about 6:00 a.m. July 6, the morning of her death. 2. The victim was found dead by the maid when she came to work at 8:30 a.m. that morning. 3. Appellant was employed on a dairy farm by the victim's husband, Johnny Hunnicutt. 4. Appellant had borrowed his brother's car between 6:30 a.m. and 8:00 a.m. that morning. 5. The tire tracks of that car matched the tire tracks in the driveway of the victim's house. 6. Appellant owned boots with treads which were capable of making mud tracks found in the victim's house. 7. Johnny Hunnicutt and one Wallace Hunnicutt also owned such boots. 8. Johnny Hunnicutt's and Wallace Hunnicutt's whereabouts were substantially accounted for during the probable time of the murder. 9. Appellant's whereabouts was not accounted for between approximately 6:00 a.m. to 8:00 a.m. the morning of the murder.

The sheriff stated he sent his deputy for the appellant because of, "The mud on the floor inside the house, the tire tracks in the driveway, and his absence for an hour and a half period when Mrs. Hunnicutt had to have been killed."

As stated in *Peters v. State*, 114 Ga. App. 595, 596 (152 SE2d 647) (1966), "Under Code § 27-207 an officer of this state may arrest without a warrant 'if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of

justice for want of an officer to issue a warrant.' Whether or not the arrest violated this statute, the constitutional validity of the arrest without a warrant depends 'upon whether, at the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.' Beck v. Ohio, 379 U. S. 89, 91 (85 SC 223, 13 LE2d 142). 'In dealing with probable cause . . . as the very name implies, we deal with probabilities. They are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, 338 U. S. 160, 175 (69 SC 1302, 93 LE 1879). There is also a great 'difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search.' Draper v. United States, 358 U. S. 307, 311-312 (79 SC 329, 3 LE2d 327). As Judge Learned Hand said in United States v. Heitner, 149 F2d 105, 106 (C. A. 2d Cir.): 'It is well settled that an arrest may be made upon hearsay evidence; and indeed, the "reasonable cause" necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties.' " Accord, *Strauss v. Stynchcombe,* 224 Ga. 859 (165 SE2d 302) (1968); *McCorquodale v. State,* 233 Ga. 369, 376 (211 SE2d 577) (1974).

The failure to hold a commitment hearing within 48 hours as required by Code Ann. § 27-212 does not render a conviction invalid nor require the exclusion of evidence. *Furman v. State,* 225 Ga. 253 (5) (167 SE2d 628) (1969).

### III. Expert Testimony

Appellant enumerates as error the ruling of the trial court permitting the sheriff to give an expert opinion regarding tire track comparison. This contention is without merit. The evidence of the sheriff's experience in the tire recapping business for 18 years formed a sufficient basis for the trial court to exercise its discretion

in permitting the sheriff to give his expert opinion. *Carter v. Marble Products,* 179 Ga. 122 (1) (175 SE 480) (1934); *Braswell v. Owen of Georgia,* 128 Ga. App. 528 (5) (197 SE2d 463) (1973). We find no error here.

### IV. Motion for New Trial

Appellant enumerates as error the overruling of his motion for new trial which asserted the general grounds. A review of the evidence shows that there was sufficient evidence to authorize the verdict of guilty. Therefore, the trial court did not err in overruling appellant's motion for a new trial on the general grounds.

*Judgment affirmed. All the Justices concur, except Gunter, Ingram and Hill, JJ., who dissent.*

ARGUED JUNE 9, 1975 — DECIDED OCTOBER 28, 1975.

*Thomas M. Jackson,* for appellant.

*Edward E. McGarity, District Attorney, Phillip Benson Ham, Arthur K. Bolton, Attorney General, Kirby G. Atkinson,* for appellee.

GUNTER, Justice, dissenting.

This case involves unconstitutional police action in obtaining and using evidence to convict a citizen accused of a crime. The majority holds that there was no state or federal constitutional violation on the part of the state in procuring and using certain evidence in this criminal prosecution. I think both constitutions were violated; I think that the evidence sought to be suppressed by the appellant was unconstitutionally obtained and unconstitutionally used in this criminal prosecution; I would reverse the conviction and order a new trial free from the unconstitutionally used evidence; and I must therefore respectfully dissent.

The Fourth Amendment, and its equivalent as contained in the Georgia Constitution, reads: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon

probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is my view that all evidence, physical and testimonial, obtained by law enforcement officers from a citizen in violation of this constitutional provision cannot be used by the state in a criminal prosecution against the seizure-victim. Mapp v. Ohio, 367 U. S. 643 (1961); Wong Sun v. United States, 371 U. S. 471 (1963); and Brown v. Illinois, —— U. S. —— (95 SC 2254, 45 LE2d 416) (1975).

What is said to here is by, way of exordium: now, to get on with the dissent.

On the morning of July 6, 1973, at some time prior to 8:30 a.m. a white female was raped and killed in her residence on a dairy farm in Monroe County, Georgia. Appellant, a black twenty-year old male who could not read and write, was a dairy farm employee on the premises where the crimes occurred. The victim's husband was the employer of the appellant. The discovery of the victim's body was reported to the sheriff, and he began his investigation at approximately 9:00 a.m. on Friday. Sometime before noon on Friday a deputy sheriff, at the sheriff's instructions, went to the dairy barn where the appellant was at work and took appellant to the sheriff's office-jail for questioning. The appellant remained at the sheriff's office-jail or in the custody of the sheriff from about 12:00 noon on Friday until sometime on the following Monday when a warrant was procured for his arrest. During this intervening period the physical evidence sought to be suppressed was obtained from him, and the incriminating testimonial evidence was obtained from him on Monday just before or just after the warrant for his arrest was procured. At what time the testimonial evidence was obtained on Monday is, as I read the transcript, immaterial, because it was clearly the fruit of the illegal procurement of the physical evidence.

There was no probable cause for the arrest of the appellant at noon on Friday. The sheriff testified that from Friday until Monday he did not know whether he had sufficient evidence to get an arrest warrant. The sheriff testified: "I wanted to wait until I got the crime lab report." Appellant's fingerprints, trousers, and boots had

been procured from him more than eight hours after he had been taken into custody, and the crime laboratory was to make a report on them. On Monday morning the sheriff also obtained samples of hair from the appellant and took them to the crime laboratory. On receiving the report from the crime laboratory in Atlanta on Monday, the sheriff called a deputy sheriff and instructed him to procure a warrant for the arrest of the appellant on the charge of murder.

The majority has held that there was "probable cause" for the arrest of the appellant by the sheriff; that the procurement by the sheriff of the physical and testimonial evidence after his arrest did not violate appellant's federal constitutional rights; and that the evidence was not subject to suppression on federal constitutional grounds.

## I.
## Appellant's Arrest Was Unreasonable Under Fourth Amendment Standards

An unreasonable arrest of a citizen by a policeman violates the Fourth Amendment. In this context the Supreme Court of the United States has said in many cases that unreasonable means "without probable cause" on the part of the arresting officer. An officer intending to make an arrest must first subjectively believe that he has probable cause for making the arrest, and, with limited exceptions, he must articulate his probable cause facts to a neutral judicial officer and procure an arrest warrant. In Terry v. Ohio, 392 U. S. 1, 20 (1968), the United States Supreme Court said: "We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, see, e.g., Katz v. United States, 389 U. S. 347 (1967); Beck v. Ohio, 379 U. S. 89, 96 (1964); Chapman v. United States, 365 U. S. 610 (1961), or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances, see, e.g., Warden v. Hayden, 387 U. S. 294 (1967) (hot pursuit); cf. Preston v. United States, 376 U. S. 364, 367-368 (1964)."

In the case at bar no reasonable reason was given for not procuring an arrest warrant, and no exigent

circumstances were present to exempt this requirement. In fact, the transcript shows, by the testimony of the sheriff himself, that the sheriff did not subjectively believe that he had probable cause to arrest the appellant. The transcript further shows that on the following Monday, after three full days of warrantless incarceration of the appellant, the sheriff subjectively believed that he had probable cause and procured an arrest warrant.

The majority has held that the sheriff had probable cause for the warrantless arrest of the appellant even though the sheriff himself, according to his own testimony, did not know it. It is difficult for me to understand how a court can hold that an officer has probable cause to make a warrantless arrest when the officer himself is unaware of that fact.

I think the arrest in this case without first procuring a warrant was unreasonable and violated the Fourth Amendment; putting the warrant procedure aside, I think there was no probable cause for a warrantless arrest, and the arrest was unreasonable and violated the Fourth Amendment; and I further think that the incarceration of the appellant for three days without taking him before a judicial officer for a probable cause determination was unreasonable and violated the Fourth and Fourteenth Amendments.

I quote Mr. Justice Frankfurter: "Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby an accused was interrogated in secret for hours on end. See Ploscowe, The Development of Present-Day Criminal Procedures in Europe and America, 48 Harv. L. Rev. 433, 457-58, 467-473 (1935). Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skilful investigation. 'The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed., 1824). The requirement of specific charges, their proof

beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights—these are all characteristics of the accusatorial system and manifestations of its demands. Protracted, systematic and uncontrolled subjection of an accused to interrogation by the police for the purpose of eliciting disclosures or confessions is subversive of the accusatorial system. It is the inquisitorial system without its safeguards. . . . In holding that the Due Process Clause bars police procedure which violates the basic notions of our accusatorial mode of prosecuting crime and vitiates a conviction based on the fruits of such procedure, we apply the Due Process Clause to its historic function of assuring appropriate procedure before liberty is curtailed or life is taken." Watts v. Indiana, 338 U. S. 49, 54 (opinion of Frankfurter, J.).

## II.
## The Searches and Seizures Were Unreasonable under Fourth Amendment Standards

The searches and seizures in this case were not contemporaneous with or "incident to the arrest." The transcript shows that the earliest of the searches and seizures occurred approximately eight and a half hours after the warrantless arrest of the appellant. I acknowledge that an arresting officer making a valid arrest can make a contemporaneous search and seizure that is incident to the arrest and therefore valid. However, searches and seizures following a warrantless arrest, made during the course of three days following the arrest without taking the arrested person before a judicial officer for a probable cause hearing, are not searches and seizures incident to an arrest. Such searches and seizures, in my opinion, are unreasonable and violate the Fourth Amendment.

A warrantless arrest, even with probable cause, becomes an unconstitutional arrest under Fourth Amendment standards unless the arresting officer takes the person arrested before a judicial officer for a probable

cause hearing within a reasonable time. This was not done in this case, and the searches and seizures during the three-day period of warrantless incarceration violated the Fourth Amendment.

"Inquiry on the street and detention for identification, however, should be sharply distinguished from detention at the police station for purposes of interrogation. At this point, still another factor should be added to the list of those considered in determining reasonableness under all the circumstances. 'In the Anglo-American law, there is no regular provision for police examination of a person suspected of crime.' The absence of such a provision is implicit in the requirements of the common law; whether an arrest is made with or without a warrant, the duty of the officer is to promptly take the arrested person before a magistrate. The practical basis for this rule is apparent; 'ours is the accusatorial as opposed to the inquisitional system.' Opportunity for prolonged police investigation presents the most dangerous threat to that system. In the federal courts, the codification of the common law doctrine respecting prompt arraignment has been enforced by a rule excluding from evidence the products of an unlawful detention prior to a hearing before a magistrate. The rule itself is not based upon the Constitution; it is the product of the Supreme Court's supervisory power over the administration of federal criminal justice and hence inapplicable to the states.

"However, since the decision in Wong Sun v. United States, a constitutional principle requiring the exclusion of evidence under certain circumstances may also be applicable in this area. Although the question was not directly involved in Wong Sun, it would seem that a violation of the right to prompt arraignment, being a fundamental part of the arrest process, would also be a violation of the Fourth Amendment, and evidence which is the product thereof should be inadmissible upon constitutional grounds. In any event, it seems clear that the underlying substantive right which is here involved is grounded in the Constitution. Its observance is indispensable to a cluster of basic rights including the right to bail and the right to habeas corpus. Furthermore,

as indicated above, it bears an intimate relationship to the requirement of the Fourth Amendment of reasonable seizures. 'What real meaning is left in the Fourth Amendment's guaranty against arbitrary arrest if the arrestee is unable to reach a judicial officer within a reasonable time to determine whether or not his arrest was arbitrary?' " Leagre, The Fourth Amendment and the Law of Arrest, 54 J. Crim. L., C. & P. S. 393, 417 (1963).

III.

### The Fourth and Fourteenth Amendments Require the Suppression of Unconstitutionally Seized Evidence

Mapp v. Ohio, 367 U. S. 643 (1961) said that the Fourth and Fourteenth Amendments require the suppression of unconstitutionally seized evidence in the prosecution of a seizure-victim in a state court. Mapp held: "Today we once again examine Wolf's documentation of the right to privacy free from unreasonable state intrusion, and, after its dozen years on our books, are lead by it to close the only courtroom door remaining open to evidence secured by official lawlessness and flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority,* inadmissible in a state court." Pp. 654, 655.

In Wong Sun v. United States, 371 U. S. 471 (1963), the Supreme Court of the United States held that unconstitutionally procured evidence, both physical and testimonial, must be suppressed in a criminal prosecution of the seizure-victim.

In Brown v. Illinois, supra, (1975), the Supreme Court of the United States declined to overrule Wong Sun and held that the unconstitutionally obtained evidence in that case had to be suppressed.

Mr. Justice White's concurring opinion in Brown v. Illinois was: "Insofar as the court holds (1) that despite Miranda warnings the Fourth and Fourteenth Amendments require the exclusion from evidence of statements obtained as the fruit of an arrest which the arresting officers knew or should have known was without probable cause and unconstitutional, and (2) that the statements obtained in this case were in this category,

I am in agreement and therefore concur in the judgment." 45 LE2d 428.

Reasons for the constitutional requirement of suppression of illegally obtained evidence in criminal prosecutions were well-stated by Justice Traynor of the Supreme Court of California in 1955, some six years prior to the Mapp declaration by the Supreme Court of the United States.

In People v. Cahan, 44 Cal. 2d 434 (282 P2d 905) (1955), Justice Traynor said: "It is contended, however, that the police do not always have a choice of securing evidence by legal means and that in many cases the criminal will escape if illegally obtained evidence cannot be used against him. This contention is not properly directed at the exclusionary rule, but at the constitutional provisions themselves. It was rejected when those provisions were adopted. In such cases had the Constitution been obeyed, the criminal could in no event be convicted. He does not go free because the constable blundered, but because the Constitutions prohibit securing the evidence against him. Their very provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught." P. 449.

"We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers.

"When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge. '(N)o distinction can be taken between the government as prosecutor and the government as judge. If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the

judge to allow such iniquities to succeed.' Holmes, J., dissenting in Olmstead v. United States, 277 U. S. 438, 470 (48 SC 564, 575, 72 LE 944). Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such 'dirty business.' See, McNabb v. United States, 318 U. S. 332, 345 (63 SC 608, 87 LE 819)." P. 445.

## Conclusion

I believe that a fair prosecution by the state is an integral part of a fair trial conducted by the state; a fair criminal trial conducted by the state is mandated by the Due Process Clause of the Fourteenth Amendment; and evidence procured by the state in violation of the Constitution must be rejected in a fair trial. The physical and testimonial evidence procured from the appellant during the three-day period of his warrantless imprisonment falls in that category. I would therefore reverse the conviction and order a new trial free from the unconstitutionally seized evidence.

I think the court, by its decision today, shrinks from the majesty of the Fourth and Fourteenth Amendments as an owl shrinks from light.

I respectfully dissent.

INGRAM, Justice, dissenting.

I concur in Divisions I, III and IV of the per curiam opinion, but not in Division II. In my judgment, Division II of the opinion is incorrect for at least two substantial reasons. First, probable cause did not exist at the time that appellant was arrested. Since the initial arrest was without probable cause, it was illegal and the majority fails to apply Wong Sun v. United States, 371 U. S. 471 (1963) and Brown v. Illinois, —— U. S. —— (95 SC 2254, 45 LE2d 416) (1975), in analyzing and disposing of the federal constitutional issues created by the circumstances of appellant's arrest and detention in this case and the evidence taken from him while he was in custody.

Secondly, the majority opinion effectively repeals the Georgia arrest provisions of the Code. Section 27-207 provides an arrest may be made by an officer without a warrant only if the offense is committed in his presence; or, the offender is endeavoring to escape; or, for other

cause there is likely to be a failure of justice for want of an officer to issue a warrant. None of these three exceptions was applicable here and in fact a warrant was finally sought and easily obtained for appellant on Monday after he had been arrested on the preceding Friday and detained in custody since that time. Code Ann. § 27-313 provides in the case of an unlawful search that the evidence be suppressed. Moreover, Code Ann. § 27-212 provides that when a person is arrested without a warrant, "the person arresting shall without delay convey the offender before the most convenient officer authorized to receive an affidavit and issue a warrant." That section further provides that "[n]o such imprisonment shall be legal beyond a reasonable time allowed for this purpose and any person who is not conveyed before such officer within 48 hours shall be released."

In my judgment, these sections of the Code are clearly applicable to this case and public justice is not served by this court's failure to enforce them. Thus, I find no support in law for Division II of the majority opinion and conclude it is wrong as a matter of federal and state law. I would order a new trial and hold that the evidence illegally obtained from appellant during his illegal detention could not be used against him. If he is guilty the state should be able to prove it without using this legally inadmissible evidence. The rights of the innocent, as well as the guilty, are put in serious jeopardy when we affirm a conviction that is based upon evidence obtained in violation of federal and state law. Therefore, I must dissent.

HILL, Justice, dissenting.

Without any question, the jury's finding that David Sanders is guilty of murdering Sheila Hunnicutt is supported by the overwhelming weight of the evidence admitted at trial. That however is, unfortunately, not the legal issue.

The legal issue which divides this court is the exclusionary rule.

If that rule is applicable to the physical and testimonial evidence here involved, then a new trial must be granted but the admissible evidence would be

insufficient to convict that person shown by the excluded evidence to be guilty of murder.

The majority seek to avoid this unwanted result by finding that probable cause to arrest David Sanders existed at 11:30 a.m. on July 6. I am unable to accept that finding because the sheriff testified that he did not have sufficient evidence to obtain an arrest warrant at that time. Moreover, the sheriff testified that before he questioned Sanders that evening, he did not think that David Sanders had committed the crime. Therefore, I am unable to find probable cause for the "arrest" at 11:30 a.m. and thus I am unable to concur in Division II of the per curiam opinion.

On the other hand, implicit in the constitutional protections afforded criminal defendants is the right of a government to protect its citizens by securing convictions of those persons guilty of crimes against other citizens. It is acceptable to protect the rights of privacy of all citizens by freeing gamblers and smut peddlers. Weeks v. United States, 232 U. S. 383 (34 SC 341, 58 LE2d 652) (1914); Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081) (1961). It is quite a different thing to "protect" citizens by freeing murderers. It is for the foregoing reasons that I am unable to join an absolutist dissent in this case.

Being unable to agree with either the majority or the dissents, I would find that the arrest occurred Friday evening when David Sanders, after being advised of his Miranda rights (including his rights to counsel), told the sheriff he had gone to Hamm's store for cigarettes, an assertion which the sheriff already knew to be false. At that point, coupled with other known information the sheriff had probable cause for arrest.[1] Thus, the fingerprints, boots and trousers were legally taken that Friday evening. To me, an 8:30 p.m. arrest is consistent with the facts and is a determination which a court can make. It is also consistent with the sheriff's testimony

---

[1] The sheriff's testimony shows that from and after that Friday evening, he suspected David Sanders but wanted to see the crime lab report before obtaining a warrant.

given at the commitment hearing that he did not consider Sanders to be in custody until "About 8:30 that night when we started talking to him, when we had some restraint on him."

It is true that Sanders spent the afternoon and early evening in a room at the jail, but according to the testimony he was watching television. Moreover, the deputy was not sent to arrest Sanders at 11:30 a.m. He was sent to question his brother and then to bring Sanders to the office. The questioning of the brother prior to driving Sanders to town is, to me, consistent with the sheriff's testimony.

Eight and a half unexplained hours is, indeed, a long time to wait at the jail to answer questions. However, the sheriff undoubtedly had plenty to do on the afternoon and evening of July 6. Unfortunately, the record does not provide a detailed account of all the sheriff's activities.[2]

On the other hand, the evidence offered by the state which shows that Sanders was not arrested at 11:30 a.m. stands unrefuted by the evidence offered by the defendant.

Based upon an 8:30 p.m. arrest with probable cause, I would find the fingerprints, boots and trousers admissible under the Fourth Amendment. Hence the incriminating statement would be admissible. I would find the hair samples taken Monday morning to be inadmissible under the Fourth Amendment.

Turning to Georgia law, I would find the boots and trousers inadmissible under Georgia's exclusionary statute, Code Ann. § 27-313 (a) (1). Insofar as Georgia's exclusionary statute might be applicable to the fingerprints, see dissenting opinion of Mr. Justice

---

[2]Because we do not have statutory provisions for discovery in criminal cases in Georgia, defense counsel may use a hearing on a motion to suppress in an effort to obtain discovery from investigating officers. On the other hand, the investigating officers are reluctant to volunteer information at such hearings. The consequence is that information is not brought out at the very time it should be forthcoming insofar as appellate review is concerned.

Stewart in Davis v. Mississippi, 394 U. S. 721, 730 (89 SC 1394, 22 LE2d 676) (1968).

I would reverse the conviction and remand this case for a new but meaningful trial. Although I concur in the first and third divisions of the per curiam opinion of the court, I respectfully dissent from the remainder of the opinion for the reasons stated above.