## 64607. RASNAKE v. THE STATE.

Quillian, Chief Judge.

The defendant appeals his conviction for three counts of violation of the Georgia Controlled Substances Act. *Held:*

1. Special Agents Chapman and Markonni of the Department of Justice Drug Enforcement Agency (DEA), with duty station at the Atlanta International Airport, received a call from DEA Agent Porro, on duty at the Orlando, Florida airport. Porro had seen the defendant enter the Orlando airport, "walking quickly," and "the manner in which he moved the suitcase said to me that the suitcase was relatively light in nature." He saw the defendant go to the Delta ticket counter and purchase a ticket for Atlanta. Defendant paid cash. Porro saw the defendant check both locks on his suitcase. The Delta ticket agent observed that there was no identification tag on the suitcase and asked the defendant to fill out a tag and then affixed it to the suitcase. Defendant again checked both locks on the bag and tried to move them back and forth, and when they appeared to move "he moved back like he started to walk away, and he looked like he had a thought and he stopped and he again reached down and again tried both locks." After seeing they were secure he walked away. Porro called Atlanta and gave this information to DEA Agent Chapman.

Agents Chapman and Markonni met defendant's incoming flight at the Atlanta airport. Agent Markonni has 15 years of law enforcement experience — three with the Federal Secret Service and twelve with DEA. He has made approximately 500 drug related arrests — approximately three-fourths of them were made following use of the "Drug Courier Profile" which involves display of characteristics commonly associated with drug traffickers. Such characteristics include quick trips to cities where drugs are known to

be distributed on a large scale. Orlando, Florida is considered to be a drug source city. Other characteristics: people who are unusually nervous, carry a large amount of cash, fly under assumed names, carry little or no luggage, or empty luggage to be used to bring drugs back to their home city. Drug couriers are unusually nervous, and "very deliberately looking at people in the gate area" is "something that drug traffickers can't seem . . . to avoid."

When Markonni and Chapman observed Rasnake arrive in Atlanta he was met by two " bikers," "motorcycle enthusiasts," wearing blue denim and black leather jackets. All three were "very nervous." Markonni's agency had worked several cases on motorcycle organizations involved in the smuggling of drugs and narcotics. The defendant looked for his luggage and then "would look around staring at people in the baggage claim area." His suitcase came up on the baggage conveyor and before picking it up "the first thing he did after he touched the suitcase was to check the locks to see if they were still locked." When the defendant and his companions entered the baggage security area the checker compared the ticket stubs with the ticket on the suitcase and the two "bikers" kept walking. All three were "unusually nervous" and "appeared to be looking around the area . . ." At that time the DEA agents approached Rasnake and identified themselves as federal officers and asked if they could speak to him. Rasnake said "yes." The agents were in civilian clothes and although they had weapons they were concealed. Agent Markonni testified that the Airlines took a dim view of anyone walking around the airport with an exposed weapon. They asked defendant for his ticket and for identification. Rasnake produced several pieces of identification which coincided with the name on the ticket. He "appeared extremely nervous. His hands were shaking and his breathing appeared to be affected." His nervousness also appeared in his speech. The agents explained that they were narcotic officers looking for drug couriers and requested his cooperation by allowing them to search his person and suitcase. Rasnake was told that they could go someplace which was more private and defendant said "I'd rather go somewhere else and walked out the door." Rasnake was looking around, apparently for "these two guys and they were nowhere in sight . . ." When they saw the DEA agents approach Rasnake they had "picked up their pace and just continued out into the parking lot and did a disappearing act." Markonni pointed to a ledge and said "we can do it right over there." Rasnake did not respond and Markonni said ". . . what's wrong? Is there something that you are worried about in your suitcase? And Mr. Rasnake hesitated for a minute and he said well, he said there is something in my suitcase and I think it could get me in trouble." Markonni said, "if

there's some small amount of marijuana, I said I don't think you'll have any trouble. I said you'll have to come with us. We'll take it. But I said the United States Treasury doesn't want to prosecute someone for a small amount of marijuana . . . if that is your concern don't worry about it . . . At that time he said I have some marijuana." Markonni then asked to examine the contents of the suitcase and Rasnake said "no." The DEA agents told Rasnake to come with them. Rasnake started to back away and they placed him under arrest and handcuffed him. They conducted a brief pat-down of his outer clothing and started to their office. Markonni noticed that Rasnake's boots did not "move right." He pulled up Rasnake's trouser leg and removed $25,000 from his boots. Rasnake also had what appeared to be four Methaqualone tablets in a trouser pocket.

Agents Markonni and Chapman had Rasnake confined and they went to the Clayton County courthouse and briefed investigator Roberts of the District Attorney's office. They advised him of the information received from DEA Agent Porro of Orlando and what had transpired at the Atlanta airport. This information was placed in an affidavit and signed by Roberts. Roberts appeared before a Justice of the Peace and requested a search warrant for Rasnake's suitcase. The search warrant was granted. The search of the suitcase revealed $2,800 in cash, four ounces of cocaine, some amphetamine tablets and other substances thought to be drugs. The trial court denied defendant's Motion to Suppress.

The DEA agents properly arrested the defendant without a warrant. " 'Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.' " *Vaughn v. State,* 247 Ga. 136, 137-138 (274 SE2d 479). " 'In dealing with probable cause . . . as the very name implies, we deal with probabilities. They are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.' Brinegar v. United States, 338 U. S. 160, 175 (69 SC 1302, 93 LE 1879). There is also a great 'difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search.' Draper v. United States, 358 U. S. 307, 311-312 (79 SC 329, 3 LE2d 327). As Judge Learned Hand said in United States v. Heitner, 149 F2d 105, 106 (C. A. 2d Cir.): 'It is well settled that an arrest may be made upon hearsay evidence; and indeed, the "reasonable cause" necessary to support an arrest cannot demand

the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties.' " *Sanders v. State,* 235 Ga. 425, 440 (219 SE2d 768), U. S. cert. den. 425 U. S. 976.

Agents Markonni and Chapman had trustworthy information from another DEA agent ( *Mitchell v. State,* 239 Ga. 456, 458 (238 SE2d 100)) that defendant was coming from a drug source city, with a very light suitcase, acting very nervous, and acted in a suspicious manner by checking and rechecking both locks on his suitcase in a short period of time. The defendant's nervousness was apparent to Agents Markonni and Chapman and Rasnake's visible char-, acteristics complied with the known characteristics of the Drug Courier's Profile. "Among the circumstances that can give rise to reasonable suspicion are the agent's knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices. Law enforcement officers may rely on the 'characteristics of the area' and the behavior of a suspect who appears to be evading police contact. United States v. Brignoni-Ponce, 442 U. S. 884-885. 'In all situations the officer is entitled to assess the facts in light of his experience.' " United States v. Mendenhall, 446 U. S. 544, 564 (100 SC 1870, 64 LE2d 497). Thus, use of the DEA developed Drug Courier Profile can provide sufficient articulable and reasonable suspicion to authorize a "Terry-type" stop. Id. at 562-563. The encounter took place in the airport concourse. The agents wore no uniform and displayed no weapon. They did not summon the defendant to their presence but approached him and properly identified themselves. All information was requested — not demanded. "Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest." Id. at 555; Accord: *State v. Reid,* 247 Ga. 445, 449 (276 SE2d 617). Hence the investigatory stop did not amount to a seizure of the person of the defendant and the subsequent voluntary confession of the defendant to current possession of marijuana provided sufficient probable cause for the warrantless arrest. *Rautenstrauch v. State,* 129 Ga. App. 381, 382 (199 SE2d 613); *State v. Perry,* 234 Ga. 842, 843 (218 SE2d 559). Incident to a lawful arrest, law enforcement authorities are authorized to make a full search of the arrestee's person. Adams v. Williams, 407 U. S. 143, 149 (92 SC 1921, 32 LE2d 612); United States v. Robinson, 414 U. S. 218, 235 (94 SC 467, 38 LE2d 427); *Stoker v. State,* 153 Ga. App. 871, 873 (267 SE2d 295). The suspicious activities of the defendant — both in Orlando and Atlanta, his voluntary confession to possession of marijuana in the suitcase, subsequent search of his person which revealed $25,000 in cash and a controlled substance — provided sufficient probable cause for issuance of the

search warrant for the suitcase. The trial court did not err in denying Rasnake's Motion to Suppress. *Smith v. State,* 160 Ga. App. 690 (287 SE2d 44).

2. The defendant contends the trial court erred by forcing him to make a "Hobson's choice" of "surrendering one constitutional right to assert another." Defendant's dilemma was brought about by his election to testify as to the events which preceded his arrest and search. Following his direct examination he was cross-examined by the prosecutor. He was asked: "The Samsonite case, was that your suitcase?" Rasnake asserted the Fifth Amendment privilege against self-incrimination.

"The true rule is that when a witness declines to answer on cross-examination certain pertinent questions relevant to a matter testified about by the witness on direct examination, all of the witness' testimony on the same subject matter should be stricken." *Smith v. State,* 225 Ga. 328, 331 (168 SE2d 587); U. S. cert. den. 396 U. S. 1045. However, ". . . a distinction must be drawn between cases in which the assertion of the privilege merely precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination." Id. at 333.

A defendant who testified is subject to cross-examination — the same as any other witness. Code Ann. § 38-415 (Code § 38-415, as amended through Ga. L. 1973, pp. 292, 294); Code Ann. § 27-405 (Ga. L. 1962, pp. 453, 454; 1973, pp. 292, 293). Counsel for the opposing party is entitled to great latitude (*Isley v. Little,* 219 Ga. 23 (17) (131 SE2d 623)), with the scope of such examination left to the discretion of the trial court. *Moore v. State,* 221 Ga. 636 (2) (146 SE2d 895).

Defendant's Motion to Suppress asserted a possessory interest in the suitcase and the trial court correctly ruled that ownership of the suitcase was relevant to the search and seizure issue. This was not a collateral matter (*Howle v. Personnel Bd. of Appeals,* 122 Ga. App. 276 (1) (176 SE2d 663)) but was a proper subject of cross-examination as Fourth Amendment rights may not be asserted vicariously. Rakas v. Illinois, 439 U. S. 128 (99 SC 421, 58 LE2d 387). The trial court did not err in striking the defendant's testimony following his assertion of the Fifth Amendment. *Emmett v. State,* 232 Ga. 110 (1) (a) (205 SE2d 231); compare *Fair v. State,* 140 Ga. App. 281, 282 (231 SE2d 1).

*Judgment affirmed. Shulman, P. J., and Carley, J., concur.*

DECIDED NOVEMBER 23, 1982 —
REHEARING DENIED DECEMBER 15, 1982.

*Edward Marger, Robert O. Davies,* for appellant.
*Robert E. Keller, District Attorney, Steven E. Lister, Assistant District Attorney,* for appellee.