## 32223. BARROW v. THE STATE.

UNDERCOFLER, Presiding Justice.

We have granted Barrow's application for interlocutory appeal to consider important questions concerning the compositions of the grand jury that indicted him and the traverse jury that will try him for murder. Barrow faces the death penalty. The trial court sustained the legality of both juries; we reverse.

1. Barrow was indicted on April 21, 1975. Although he was represented by counsel from February 11, 1975, no motion was made regarding the composition of the grand jury. Barrow was tried, convicted, and given the death sentence for murder, but his conviction was overturned by this court and sent back for a new trial. *Barrow v. State,* 235 Ga. 635 (221 SE2d 416) (1975). Barrow then filed his challenge to the grand jury, which the trial court overruled as not timely. We, however, because of the special facts of this case, reverse the trial court on this

point.

The general rule is that the grand jury composition must be challenged prior to indictment unless the defendant shows he had no actual or constructive notice of the illegality. *Sanders v. State,* 235 Ga. 425 (219 SE 768) (1975); *McHan v. State,* 232 Ga. 470 (207 SE2d 457) (1974); *Williams v. State,* 210 Ga. 665 (82 SE2d 217) (1954). Failure to do so is deemed a waiver. *Cobb v. State,* 218 Ga. 10 (126 SE2d 231) (1962). Under these general rules Barrow's challenge would indeed have been filed too late.

We have also said, however, that "it is a lawyer's proper function and duty to determine whether it is to the interest of his client to raise the issue of systematic exclusion. *Cobb v. State,* 218 Ga. 10, 24 (6) (126 SE2d 231) [1962]." *Burkes v. Whitley,* 221 Ga. 108, 109 (143 SE2d 171) (1965). In his testimony at the hearing on Barrow's motions, the public defender, who had represented Barrow at his first trial, made very clear that he had not considered making such a challenge, even though he realized under our cases he probably would have been successful.

The attorney stated that the reasons he did not challenge the grand jury included the fact that he had been appointed for a two-year term by the superior court judge of that county and wanted to be rehired, that he felt adverse community pressure would inure to him personally if he attempted to have more blacks placed on the grand jury, and that he had obligations to other clients whom he did not want to jeopardize by bringing an unpopular motion. He said he also felt some community pressure because he represented Barrow, who was accused of killing a well-liked white member of the community, and because he though such a challenge would be costly in both time and money to the county. For all these reasons, he made it a blanket policy not to challenge the grand jury in any case, thinking that for personal reasons, as well as for the client's sake, it would not be the expedient course to follow.

On cross examination by the state: "Q. Were there not other reasons besides being Public Defender that you did not file such a challenge in Keithen Barrow's case? A: Well, there were other reasons but they all reflect on my

being Public Defender, yes sir. Q: Are you saying that you did not, and do you remember that you told me that one of the reasons you did it [sic] was because you felt that it would be in the best interest of Keithen Barrow in this case not to so file this challenge? A: Well, Keithen Barrow or anybody else for that matter."

We think on this record that Barrow's attorney did not exercise "A lawyer's proper function and duty to determine whether it is to the best interest of his client to raise the issue of systematic exclusion." *Burkes v. Whitley,* supra; *Cobb v. State,* supra. We therefore hold that under these extraordinary circumstances the trial court erred in overruling Barrow's challenge to the grand jury as having been raised too late.

2. We next reach the merits of Barrow's plea in abatement that the 1973 grand jury and the 1975 traverse jury are illegally constituted. He claims that the 1973 grand jury which indicted him and the 1975 traverse jury are unconstitutional because blacks, women, and 18 to 30-year-olds are underrepresented.

We do not consider the alleged underrepresentation of 18 to 30-year-olds because they are not a recognized class. *State v. Gould,* 232 Ga. 844 (209 SE2d 312) (1974); *White v. State,* 230 Ga. 327 (196 SE2d 849) (1973). Nor do we consider the exclusion of women on the grand jury because the 1973 grand jury which indicted Barrow was constituted before the United States Supreme Court's decision in Taylor v. Louisiana, 419 U. S. 522 (1975), holding that women as a class could not be excluded from jury service. That court made clear in Daniel v. Louisiana, 420 U. S. 31 (1974) that Taylor was not retroactive and would not apply to juries empaneled before January 21, 1975, when that opinion was decided. *Young v. State,* 239 Ga. 53 (1977). The underrepresentation of women is pertinent to the 1975 traverse jury, however. We must also consider the underrepresentation of blacks presented by both of these jury challenges. Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599) (1966).

The test to be applied was set out in *Pass v. Caldwell,* 231 Ga. 192 (200 SE2d 720) (1973), citing Whitus v. Georgia, supra. The requirements for making out a prima facie case for discrimination are two-fold. First, the

appellant must prove that an *opportunity for discrimination* existed from the source of the jury list, and, second, that the use of that infected source produced a *significant disparity* between the percentages found present in the source and those actually appearing on the grand and traverse jury panels.

(a) Significant disparity.

Blacks comprise 37.3% of the community but only 3% of the 1973 grand jury. This differential is sufficient to establish a prima facie case of systematic exclusion of blacks from the grand jury. *Sanders v. State,* 235 Ga. 425 (219 SE2d 768) (1975). "Evidence of 'spectacular' underrepresentation meets the burden, making a prima facie case of discrimination." *Pass v. Caldwell,* supra, p. 192.

The 1975 traverse jury, from which Barrow's petit jury will be chosen, was originally 11.3% black and 34.6% female versus 37.3% and 51%, respectively, in the community. The hearings in the trial court below on Barrow's challenges were suspended by the judge; he then ordered the jury commissioners to supplement the jury list so that it would "fairly represent a cross-section of the community." Barrow informed the court that 757 blacks of which 686 would have to be female were necessary to correct the percentages on the traverse jury. However, 483 names were added of which only 321 were black. Barrow claims that the supplemented traverse jury, now 22.9% black versus 37.3% in the community, and 39.2% female, as opposed to 51% in the community, is still improperly constituted.

An historical pattern of discrimination has been shown by Barrow, who submitted evidence of the underrepresentation of blacks and women over a period of years. Compare *Gould v. State,* 131 Ga. App. 811 (207 SE2d 519) (1974), affirmed in part, reversed in part 232 Ga. 844, supra, with *White v. State,* supra. See Division 3, infra. In Turner v. Fouche, 396 U. S. 346, 355, the United States Supreme Court held the Taliaferro County, Georgia, grand jury unconstitutional where blacks made up 37% of the grand jury *on a supplemented* grand jury list, and where the county was 60% black. The Supreme Court thus found that 38.3% underrepresentation of blacks and the

opportunity to discriminate made out a prima facie case of discrimination. On this Oglethorpe County traverse jury list, as supplemented, blacks are 38.6% under-represented. Therefore, Barrow has shown that a "significant disparity" existed between the source, the community, and the actual jury lists.

(b) Opportunity for discrimination.

The commissioners testified that the method of selecting jurors was to proceed through the list of voters choosing or rejecting a prospective juror on the recommendation of a commissioner who personally knew the voter. Anyone not known by a member of the commission was not selected. There were no black jury commissioners. Although attempts were at times made to identify unknown voters, this was not a regular or extensive practice. Turner v. Fouche, supra.

The fact that the potential jurors had to be known by one of the commissioners leads to the conclusion that the race and sex of the persons selected were also apparent. Although there was no evidence that jurors were consciously selected by race or sex, the method used made it incumbent on the state to show that the procedure was in fact neutral. *Pass v. Caldwell,* supra. The only evidence presented by the state was in the form of affirmations by the commissioners that qualified jurors were selected without regard to race or sex. Mere statements of good faith have never been deemed sufficient to overcome a prima facie case of discrimination. Alexander v. Louisiana, 405 U. S. 625 (1977); Turner v. Fouche, supra; Cassel v. Texas, 339 U. S. 282 (1949).

Furthermore, the testimony at the hearing in the trial court from members of the jury commission showed that the commissioners were not fully informed of their duties in composing the traverse and grand jury lists. Few, if any, realized that they could go outside of the voters' list in selecting prospective jurors. Code Ann. § 59-106 (Supp. 1976). Nor did they know it was their duty to acquaint themselves with members of the community in order to find qualified jurors. The state's statutory scheme imposes "on the jury commissioners the affirmative duty to supplement the jury lists by going out into the county and personally acquainting themselves with other citizens of

the county whenever the jury lists in existence do not fairly represent a cross-section of the county's upright and intelligent citizens." Turner v. Fouche, supra, at p. 355. Accord, Cassel v. Texas, supra.

In addition, most commissioners, on questioning, were not informed of the meaning of the term "a fairly representative cross-section of intelligent and upright citizens of the county."[1] Nor did they make any attempt to accomplish such a goal. This was true even after the trial court ordered the commissioners to supplement the list in order to bring it up to constitutional levels. After the commissioners made the required supplementation, no attempt was made to calculate the percentages of blacks and women to see if a representative cross section of the community had been attained. They just "thought it was right."

The commissioners admitted that there were blacks on the voters' list not known by any of them who may have been qualified to serve as jurors. Little attempt was made to ascertain which of these persons could have been placed on the juries. The state made no attempt, in rebutting Barrow's prima facie case, to show that the blacks on the list were in fact not qualified. Whitus v. Georgia, supra.

Women were excused upon request and the commissioners testified that this was the reason there were so few on the jury lists, although many were qualified. See Division 4, infra.

The overall result of the method of selection used, the lack of understanding of what was required on the part of the commissioners with their apparent failure to carry out the required statutory duty, and the opportunity for discrimination was a jury list that was consistently overrepresented by white males. The state failed to justify this result. Jones v. Georgia, 389 U. S. 24 (1967). We, therefore, hold that the 1973 grand jury and the 1975

---

[1] "Q: What does that term [fairly representative cross section of the community] mean to you? A: It means doing what you can to help your community. Q: That is what a cross section of the community means to you? A: Isn't that what it says, to help your neighbor?"

traverse jury of Oglethorpe County were illegally constituted and must reverse the trial court's overruling of Barrow's challenges to these juries.

3. In his third enumeration of error, Barrow claims that the trial court erred in refusing to allow evidence of the composition of juries other than those of 1971, 1973, and 1975. Because of our ruling in Division 2, however, we do not find that Barrow was thereby harmed and refuse to reverse the trial court on this point.

4. Barrow's fourth enumeration of error raises the constitutionality of Code Ann. § 59-112 (b), which allows women with children under fourteen to petition the court to be excused from jury duty. We have already held in *Zirkle v. State,* 235 Ga. 289 (219 SE2d 389) (1975), that this statute is constitutional. Barrow has, however, produced sufficient evidence to show that this statute may have been improperly applied in Oglethorpe County. No discretion appears to have been exercised *by the trial court* in excusing women with young children[2] with the result that women have thus been generally underrepresented on its juries. The commissioners almost uniformly gave this reason for the low number of women on the jury. Since these juries must be redrawn, we comment on this point so that the new juries will be composed according to the law.

*Judgment reversed. All the Justices concur, except Bowles, J., who dissents as to Division 1, and concurs specially in Divisions 2, 3,' and 4, and Jordan, J., who dissents.*

ARGUED MAY 9, 1977 — DECIDED JUNE 7, 1977.

*Millard C. Farmer, Jr.,* for appellant.

---

[2] To be excused a letter was written to the clerk. The list was carried over from year to year so that once so excused, those women were never again asked to serve. See Code Ann. § 59-124, repealed Ga. L. 1975, pp. 779, 780.

*Cleve Miller, Bryant Huff, Clete Johnson, District Attorneys, Dawson Jackson, Assistant District Attorney, Arthur K. Bolton, Attorney General, Harrison Kohler, Assistant Attorney General,* for appellee.

BOWLES, Justice, dissenting in part and specially concurring in part.

I respectfully dissent from the holding in Division 1 of the opinion because it is my firm belief that defendant has waived his right to attack the composition of the grand jury in this case. Counsel was appointed for the defendant prior to the grand jury indictment, and voluntarily elected not to make a pre-indictment challenge to the composition of that body. When he elects to do this he has waived his right to later object. *Estes v. State,* 232 Ga. 703, 708 (208 SE2d 806) (1974); *McHan v. State,* 232 Ga. 470 (207 SE2d 457) (1974); *Sanders v. State,* 235 Ga. 425 (219 SE2d 768) (1975); *Williams v. State,* 210 Ga. 665 (82 SE2d 217) (1954); *Cobb v. State,* 218 Ga. 10 (126 SE2d 231) (1962). The majority holds that based on the testimony of the attorney's reason for not making that challenge, he did not exercise a lawyer's *proper function and duty* to determine whether it is to the best interest of his client to raise the issue of systematic exclusion. An examination of the record indicates that this same lawyer very adequately represented the defendant in a very difficult case. Following the first conviction he successfully prosecuted an appeal in this court and obtained for his client a new trial. No lawyer is perfect. It is easy to look back, put the lawyer on the stand and cross examine him about his reasons for doing or not doing a particular act in the course of trial. What the lawyer says or does not say to his client is a confidential matter which cannot be penetrated under our rules of evidence, without consent. Who can say what the lawyer has in mind, whether he be a public defender, appointed counsel, or employed counsel. In any event, when faced with a difficult situation, he might realize that a grand jury which is to consider his client's case may be illegally constituted. Can he then sit idly by, allow the indictment to be returned, go to trial, lose his case, allow the defendant to employ other counsel and have the verdict and judgment reversed because of

what the defendant's lawyer might have done but did not do? There is an old saying to the effect, "Don't give a reason for what you did until you have to. By the time you have to, you may have thought of a better reason." If the majority opinion is followed we will be in the position of judging or second guessing the acts of capable counsel which I feel we should not do. This is a thicket from which we will not be able to extricate ourselves, and we will not be able to lay down rules or standards that can be followed with any degree of practicality. Additionally, the defendant and his subsequent attorney have not shown any actual prejudice by his first counsel's failure to make a timely challenge to the array of the grand jury which indicted him. In order to excuse a waiver resulting from his failure to assert an objection in timely fashion he must show prejudice. This he has not done. Francis v. Henderson, 425 U. S. 536 (96 SC 1708, 48 LE2d 149) (1976); Dumont v. Estelle, 513 F2d 793 (5th Cir.) (1975).

As to Division 2 of the majority opinion, I concur in the judgment for the reason that I feel the percentages illustrated by the defendant's motion, based on disparity, shifted the burden to the state under Turner v. Fouche, 396 U. S. 346 (90 SC 532, 24 LE2d 567). At this point the state did not, in my opinion, make the necessary showing contradicting this prima facie case. With this, I suppose it will be necessary for the jury commissioners to revise the boxes again, even though their prior efforts in this respect appear bona fide. Mathematical perfections are never going to be obtainable in this important segment of our court proceedings. If we choose jury panels, in keeping with the Georgia statutes as they now exist; obtain the help of competent legal counsel in doing so; and keep adequate records of all procedures followed, I believe we can obtain constitutionally acceptable juries, representing a cross section of all citizens of our communities. These should not be subject to attack, even though the results obtained may not be in the same mathematical proportions as the percentages of male or female, black or white, shown by census records relate to the population as a whole. Those who attack our system, demand perfection but contribute little, except criticism. The goal is a reasonable goal not a mathematical result.

All law and justice must be based on reason.

JORDAN, Justice, dissenting.

The majority opinion of this court places an asinine arithmetical quota system for the composition of juries in Georgia. Such is not required under the Constitution of the United States, or of this state, or by any of the decisions of the highest court of either.

Granted, the grand jury of 1973 was unconstitutionally composed with only 3% blacks out of a total of 37.3% in the community. Faced with this, the jury commissioners made an apparent bona fide effort to secure a fairly representative cross-section of the citizens of the community by the addition of 321 black persons to the jury list. This brought the black percentage to 22.9% versus 37.3% in the community and 39.2% female versus 51% in the community.

This court says to the jury commissioners that your efforts are fruitless, go back and keep adding names until you reach the exact percentage of blacks and females; only then can you give the defendant a "perfect" trial.

No system of justice can ever reach the pristine heights of perfection. If a defendant is put to trial with jurors who "fairly represent a cross-section of the community" and who swear impartiality between him and the state, what more can he ask? Nothing more than that is needed or required.

I respectfully dissent from Division 2 of the opinion.