**Michael Gene BERRYHILL,**
**Petitioner–Appellee,**
**Cross–Appellant,**

v.

**Walter ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellant, Cross–Appellee.**

No. 87–8508.

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1988.

**634**

Michael J. Bowers, Atty. Gen., William B. Hill, Jr., Susan V. Boleyn, Sr. Asst. Attys. Gen., Atlanta, Ga., for Zant.

Stephen G. Milliken, Milliken, Van Susteren and Canan, Washington, D.C., Stephen B. Bright, Atlanta, Ga., for Berryhill.

Before TJOFLAT, VANCE and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

### I.

The petitioner in this case, Michael Gene Berryhill, is a Georgia death row inmate. In 1975, a jury in Bartow County, Georgia convicted him on charges of felony murder and armed robbery. At the conclusion of petitioner's sentencing hearing, the jury returned a verdict imposing the death penalty. The Supreme Court of Georgia affirmed the conviction and sentence on direct appeal. *Berryhill v. State,* 235 Ga. 549, 221 S.E.2d 185 (1975), *cert. denied,* 429 U.S. 1054, 97 S.Ct. 769, 50 L.Ed.2d 771 (1977). Petitioner thereafter filed, pursuant to Ga.Code Ann. § 50–127 (1979), a petition for a writ of habeas corpus in the Superior Court of Butts County. The court denied relief, and, on appeal, the Supreme Court of Georgia affirmed. *Berryhill v. Ricketts,* 242 Ga. 447, 249 S.E.2d 197 (1978), *cert. denied,* 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979).

Petitioner then filed a petition for a writ of habeas corpus in federal district court. The district court, in an unpublished order, directed the state of Georgia to grant petitioner a new trial.[1] We affirmed in an unpublished opinion.[2]

A Bartow County grand jury reindicted petitioner on May 7, 1981, charging him once again with felony murder and armed robbery. The Superior Court of Bartow County convened a jury trial on June 1, 1981, at the conclusion of which the jury returned a verdict of guilty. The jury trial

---

1. The district court concluded that petitioner's trial was constitutionally infirm under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because the state had introduced at trial statements by petitioner which police had elicited from him, while he was in custody, after he had requested counsel.

2. *Zant v. Berryhill,* 640 F.2d 382 (5th Cir.1981).

then reconvened and, once again, petitioner received the death penalty. The Supreme Court of Georgia affirmed the conviction and sentence on direct appeal. *Berryhill v. State,* 249 Ga. 442, 291 S.E.2d 685, *cert. denied,* 459 U.S. 981, 103 S.Ct. 317, 74 L.Ed.2d 293 (1982). As he had done after his 1975 conviction was affirmed on direct appeal, petitioner filed a petition for a writ of habeas corpus in the Superior Court of Butts County. The court denied relief, and the Supreme Court of Georgia denied petitioner's application for a certificate of probable cause to appeal. The United States Supreme Court denied certiorari on August 2, 1984. *Berryhill v. Francis,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984).

On August 25, 1985, petitioner returned to federal district court and filed a petition for a writ of habeas corpus. It is this petition that we consider in this case. Petitioner asserts that his 1981 conviction and sentence are invalid on several grounds. Four of the grounds he cites are based on alleged violations of his right, under the sixth and fourteenth amendments, to an impartial jury. First, he claims he was denied the right because his trial jury was drawn from a master jury list which, due to an underrepresentation of women, failed to reflect a fair cross section of the community. Second, he claims he was denied the right because the trial court "fail[ed] to grant a change of venue, or [to] take other appropriate measures, such as individual sequestered voir dire, to ensure that [his] verdict and sentence [were] not affected by strong community feeling against [him]." Third, he claims he was denied the right because the trial judge prevented his attorney from asking questions at voir dire which were essential to ascertaining the impartiality of the prospective jurors. And fourth, he claims he was denied the right because the trial court refused to strike from the venire an individual who expressed an irrevocable commitment to imposing the death penalty.

The remaining grounds petitioner cites involve a variety of other constitutional violations. His fifth claim is that his conviction and sentence are invalid under the due process clause of the fourteenth amendment because misconduct by the prosecutor and bias on the part of the trial judge rendered his trial fundamentally unfair. His sixth claim is based on the equal protection clause of the fourteenth amendment: he argues that his conviction must be overturned because the underrepresentation of women on the master jury list was the result of intentional discrimination against women. His seventh claim is that he was denied effective assistance of counsel, in violation of the right to counsel guaranteed by the sixth and fourteenth amendments. His eighth claim is that he was denied his right, under the eighth and fourteenth amendments, to be free from cruel and unusual punishment because the trial court coerced the jury into returning a death sentence. Finally, his ninth claim is that he was denied his right to be free from cruel and unusual punishment because the trial court failed properly to instruct the jury that it could, in reaching its sentencing verdict, consider as mitigating evidence testimony concerning petitioner's mental condition.

Following an evidentiary hearing, the district court determined that the second and eighth claims had merit, and accordingly entered an order directing the State of Georgia to grant petitioner a new trial. The court considered the remaining claims, but concluded that each lacked merit. Respondent now appeals from the order granting relief on the basis of the second and eighth claims, and petitioner cross-appeals the district court's rejection of the other seven claims. Because we conclude that petitioner is entitled to relief on the basis of the first claim, we need not address the merits of the others.

## II.

At the time of the events pertinent to this case, Georgia law required the superior court of each county to appoint a six-member board of jury commissioners, whose duty it was to "compile and maintain and revise a jury list of intelligent and upright citizens of the county to serve as

jurors." Ga.Code Ann. § 59–106 (1979).[3] Pursuant to this mandate, the Bartow County board of jury commissioners would compile a master jury list every other year, choosing a sufficient number of names to fill trial jury venires for a two-year period. The venire from which petitioner's trial jury was selected was drawn from the master list compiled by the Bartow County board in August 1979.

At the evidentiary hearing in the district court, petitioner introduced, without objection by respondent, evidence showing that the master list contained the names of 2833 persons, of whom 1115—or 39.36%—were women. Petitioner also introduced, again without objection by respondent, population figures from the 1970 census. These figures showed a total population for Bartow County of 32,663. Of that total, 16,753—or 51.29%—were females. The census figures also showed the gender makeup of various age groups in Bartow County. The eighteen-and-above age group was comprised of 21,015 persons, of whom 11,092—or 52.78%—were women.

Petitioner also introduced into evidence the testimony of the clerk of the Superior Court of Bartow County, Woodrow H. Bradley, who explained the procedures the board of jury commissioners used when it compiled the master jury list.[4] Bradley testified that as clerk he was an ex officio member of the board, as well as its secretary. Under his direction, the board met in August 1979 to compile a new master jury list. The board projected at the time that approximately 3000 names would be needed to fill the trial jury venires that would be called over the next two years. In amassing names for the list, the commissioners used as their primary source the Bartow County voter registration roll from the 1978 general election.[5]

Bradley testified that the commissioners considered the names in the order in which they appeared on the voter registration roll, and, applying the criteria set out in Ga.Code Ann. § 59–106, selected for the master jury list persons they considered "intelligent and upright." Bradley further testified that the commissioners summarily passed over the names of some women. He stated that they did so in certain instances because they were not sufficiently familiar with the particular woman to determine whether she was "intelligent and upright." Bradley explained that

> we tried our best to stick to women that we knew, professional business women, ... and we tried our best to not—where a man's name was in the jury list, unless his wife was a business or professional woman we did not select the wife.

In other instances, Bradley stated, the commissioners passed over a particular woman's name because she had contacted one of them and had specifically asked that they not include her name on the list. Bradley testified that if a woman making such a request was pregnant, had young children, or was employed as a teacher or a nurse, the commissioners would comply with the request.[6]

---

3. This section has been recodified, with minor modification of language, in section 15–12–40 of the current Georgia Code.

4. Petitioner introduced Bradley's testimony in the form of transcripts from three prior proceedings. Two of the prior proceedings were pretrial hearings in petitioner's own prosecution. The third proceeding was a pretrial hearing in an unrelated criminal case which, like petitioner's case, involved a challenge alleging underrepresentation of women on the Bartow County master jury list compiled in August 1979.

5. Bradley testified that the commissioners used some secondary sources. For example, they obtained some names from high school graduation lists.

6. In complying with these requests, the commissioners acted contrary to state law. Under a Georgia statute then in force, "housewi[ves] with children 14 years of age or younger" could claim an exemption from jury service. Ga.Code Ann. § 59–112(b) (1979) (repealed 1984). A person claiming that exception could be excused, however, only "by the judge of the court to which [she] ha[d] been summoned or by some other person ... duly appointed by order of the chief judge to excuse jurors." *Id.* The board of jury commissions had no power to grant such excuses. *See Barrow v. State*, 239 Ga. 162, 168, 236 S.E.2d 257, 261–62 (1977); *see also Robinson v. Kimbrough*, 558 F.2d 773, 774 (5th Cir. 1977) (en banc).

After the commissioners had amassed a sufficient number of names to meet the projected need for the next two years, they analyzed the gender makeup of the list. According to Bradley, the commissioners believed that they were required by law to compile a list that included a percentage of women that corresponded to some degree with the percentage of women in the county. Using the population percentage shown by the 1970 census, the commissioners determined that the percentage of women on the list fell short of the mark. To correct the deficiency, they went about adding more women to the list. They added women until 39.36% of the persons on the list (1115 out of 2833) were women. "Then we quit," Bradley testified, because 39.36% was "in the ballpark guidelines that the Supreme Court would allow." [7]

In analyzing petitioner's claim, the district court first identified the Bartow County adult population (persons age eighteen or older) as the relevant community for fair-cross-section purposes. The court found that petitioner had established that women comprised 52.78% of that community. The court further found that women comprised only 39.36% of the persons included on the master jury list. Notwithstanding this disparity, the court concluded that "women were sufficiently represented on the [master] jury list to meet the requirements of the Sixth Amendment."

### III.

█ A violation of a state criminal defendant's rights under the sixth and fourteenth amendments occurs when he is tried by a jury drawn from a source which, due to systematic exclusion of a distinctive group, fails to reflect a "fair cross section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The terminology used to describe the right provides the key to understanding its nature: the defendant is entitled not to a perfect cross section of the community, but to a *fair* cross section. Put another

way, the defendant is entitled to a trial jury drawn from a source in which the representation of distinctive groups is "fair and reasonable" in relation to their representation in the community. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

The right is defined, therefore, in a way that makes some allowance for the difficulty of achieving a master jury list that precisely mirrors the makeup of the community. Common sense tells us that achieving a perfect cross section is a near impossibility. Factors outside the state's control may affect the makeup of the master jury list. Often, for example, some of the persons chosen for the list will die before a new list is compiled, thus upsetting whatever balance the original list reflected. Additionally, some groups that are distinct for fair-cross-section purposes may be made up of persons who do not exhibit characteristics that obviously distinguish them from others in society. Ensuring adequate representation of such a group is inherently problematic due to the difficulty of determining in the first instance how large a segment of the community it comprises. Finally, even if the state's selection procedure involves drawing names on a purely random basis from a source which itself is made up of a near-perfect cross section, some deviation is inevitable due to chance.

These common sense observations compel the conclusion that what is "fair and reasonable" in the sixth amendment fair-cross-section sense is a function of the difficulty of achieving a perfectly representation master jury list. This means, of course, that a given degree of deviation from perfect representation with respect to a particular group has little, if any, meaning apart from the specific context in which it occurs. Thus, a given degree of deviation might be constitutionally permissible in a case where the state took every reasonable step to ensure representation of all distinctive groups, yet constitutionally im-

---

**7.** Bradley testified that the jury commissioners had followed the same procedure when compiling the prior master jury list and had achieved approximately the same level of representation of women.

permissible in a case where the state neglected to take such steps.[8]

These observations about the nature of the fair-cross-section right have direct implications for the kind of showing a defendant must make to establish a violation. The burden of proving a fair-cross-section violation falls on the defendant. After the defendant has established that the group in question is "distinctive" for fair-cross-section purposes, and that the group was systematically excluded from the jury source, he must then establish that the group's underrepresentation was unfair and unreasonable. Because the state usually controls the evidence necessary to prove this last element, the law accords the defendant the benefit of a presumption, based on a bare showing of underrepresentation, which operates to compel the state to come forward with evidence relevant to that element. *See generally Duren,* 439 U.S. at 363–69, 99 S.Ct. at 668–71. Thus, once the defendant establishes the facts that give rise to the presumption, the state must provide some explanation why, under the circumstances, the underrepresentation of the group was not unfair and unreasonable. If the state offers no plausible explanation, the defendant prevails on the strength of the presumption: based on the bare showing of underrepresentation, the court must hold as a matter of law that the exclusion of the group was unfair and unreasonable. If, on the other hand, the state does offer a plausible explanation, the defendant will not prevail on the strength of the presumption unless he persuades the court not to accept the state's explanation.

In this case, petitioner did not rely on the presumption, for he presented direct evidence that the demonstrated degree of underrepresentation was, under the circumstances, unfair and unreasonable. Notwithstanding this evidence, the district court simply considered the demonstrated disparity in isolation and concluded that it was insufficient to support a constitutional claim. The court in effect focused on whether petitioner had made a sufficient showing of underrepresentation to invoke the presumption described above. This approach was mistaken. In a case where the defendant has presented direct evidence that the underrepresentation was unfair and unreasonable, the presumption becomes irrelevant.[9] In such a case, the ultimate legal question of whether the underrepresentation was unfair and unreasonable is directly before the district court. Thus, the focus of the court's analysis should not have been the size of the disparity viewed in isolation, but the size of that disparity weighed against the difficulty of achieving a cross section.

Where, as here, a district court has misapplied the law in deciding a mixed question of law and fact, we usually remand the case for further proceedings. That is unnecessary in this case, however. There is no dispute that the group alleged to be underrepresented is a distinctive group for fair-cross-section purposes; precedent clearly holds that women constitute such a group. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *Taylor,* 419 U.S. at 531, 95 S.Ct. at 698. There is no dispute that women were in fact underrepresented on the Bartow County master jury list. Women made up 52.78% of the adult population of the county,[10] but only 39.36% of the per-

8. The question is a mixed question of fact and law. The degree of underrepresentation is a question of fact. Whether that underrepresentation is fair and reasonable in light of the circumstances is a question of law.

9. For this reason, we have no occasion to address the issue of what bare showing of underrepresentation would suffice to invoke the presumption in the circumstances of this case.

10. Respondent has not challenged the district court's ruling that the adult population (persons age eighteen or older) of Bartow County is the

relevant community for fair-cross-section purposes. We therefore express no opinion on the correctness of that ruling. Cf. *United States v. Esle,* 743 F.2d 1465, 1478 (11th Cir.1984) (Tjoflat, J., specially concurring).

Nor has respondent challenged the district court's finding that women made up 52.78% of the relevant community. Such a finding, if challenged, will stand unless clearly erroneous. *Id.* at 1472 n. 12.

We note that the 52.78% figure is taken from the 1970 census. Petitioner also introduced into evidence population figures from the 1980 census. These figures show that in 1980, women

sons on the master jury list. There is also no dispute that this underrepresentation was the result of systematic exclusion; respondent does not dispute that the method of selection the commissioners used produced the demonstrated underrepresentation. The only question remaining in this case is the legal question of whether the underrepresentation petitioner demonstrated is unfair and unreasonable, in violation of the fair-cross-section requirement.

Petitioner's direct evidence established that the Bartow County jury commissioners, acting pursuant to Georgia law, used a highly subjective method to construct the master jury list. That method involved including on the list only the names of those persons the commissioners considered "intelligent and upright." Petitioner's evidence further established that the commissioners realized that their method had resulted in significant underrepresentation of women, but then added more women to the list only to a point substantially short of full representation.

Certainly, a selection method such as that used by the Bartow County jury commissioners is not incapable of producing a constitutional result. *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). Indeed, a system by which names are handpicked based on knowledge of the potential jurors' personal traits provides an opportunity to achieve with relative ease something approaching a perfect cross section, especially with respect to groups, such as gender-based groups, that exhibit readily identifiable physical characteristics. Yet here, even though they recognized that women were underrepresented on the list, the jury commissioners chose not to correct the problem by way of means that were very readily available to them. Therein lies the strength of petitioner's case.

■ Relying on Bradley's testimony, respondent argues that the underrepresentation of women was justified under the circumstances. Reduced to its essentials, respondent's argument is that the jury commissioners held a good faith belief that they had achieved a fair cross section. In Bradley's own words, the commissioners believed that representation of women on the order of 39.36% "was in the ballpark guidelines that the Supreme Court would allow." This explanation is inadequate as a matter of law. A defendant's right to a fair cross section does not evaporate merely because those selecting the master jury list operated under misguided notions of constitutional law. The focus of our inquiry is not the bona fides of the state, but whether the representation of women was, under the circumstances, objectively fair and reasonable. Given the relative ease with which the underrepresentation could have been corrected in this case, we simply cannot conclude that the representation of women on the master jury list was fair and reasonable. Petitioner has therefore established a violation of the sixth amendment's fair-cross-section requirement.

AFFIRMED.

CLARK, Circuit Judge, specially concurring.

I concur that the one issue discussed in the majority opinion correctly disposes of the case. However, I believe that affirming the district court upon one of the other issues will avoid the errors of the second trial and avoid another grant of the writ.

Excessive pretrial publicity can deny a defendant of his right to be tried by a fair and impartial jury. *See, e.g., Coleman v. Kemp,* 778 F.2d 1487 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The district court found that there had been a significant possibility of prejudice before Berryhill's second trial, and that the trial court's failure to ensure an adequate voir dire examination had deprived Berryhill of his right to be tried by an impartial jury. *See Jordan v. Lippman,* 763 F.2d 1265, 1276 (11th Cir.1985) (when a significant possibility of prejudice is shown, voir dire must be adequate to unearth potential prejudice). I would affirm the district court on this ground as well.

comprised 53.10% of the Bartow County adult population.

### The Publicity

Widespread publicity attended Berryhill's first trial. Berryhill's subsequent appeals and reindictment were reported by the press in Bartow County, where Berryhill was tried, and in Cartersville, where the burglary and murder had taken place. A month before Berryhill's second trial, the clerk of the court in which Berryhill was tried wrote a column for a newspaper in which he favorably commented on a case in which Judge Roy Bean, after eliciting a guilty plea from a Mexican defendant who did not speak English, had the defendant immediately hung.

A public opinion poll conducted by the University of Georgia School of Journalism showed (with a margin of error of plus or minus 6%) that 80% of those interviewed were very familiar or somewhat familiar with the case. Of those familiar with the case, 99% knew Berryhill had previously been found guilty and 81% knew he had received the death penalty. Furthermore, 78% stated that Berryhill was either definitely guilty or probably guilty, and 94% said most of their friends thought Berryhill was guilty. Finally, 62% thought Berryhill should receive the death penalty.[1]

### The Voir Dire

The trial court denied Berryhill's motion for a change of venue. It also denied Berryhill's motion for a sequestered voir dire and allowed the voir dire to be conducted in the presence of all the prospective jurors. The trial court itself questioned some jurors, and refused to allow Berryhill's counsel to ask certain questions. The district court found:

> A substantial possibility of prejudice ... was most clearly revealed at the jury voir dire itself. As in the public opinion poll, approximately 80% of the jury venire indicated upon examination by the defendant that they were either familiar or very familiar with the case. The first prospective juror who indicated familiarity with the case was excused after stating that he could not be sure that he could set aside his opinion that the petitioner was guilty. The second prospective juror who indicated that he knew about the prior trial had been a detective with the Bartow County Sheriff's Department at the time of the first trial. He stated that he had formed an opinion at that time, but that he could set it aside. The third prospective juror who indicated that he knew about the prior trial was also excused. He was excused after stating that he would believe the petitioner was guilty until the defense proved otherwise and after acknowledging his faith in the jury that first tried the case. The fourth prospective juror who indicated that he had knowledge of the prior trial was not excused, although he seemed to place the burden of proof on the petitioner when he stated that he had an opinion that "could be changed by a witness if it was proved in court." Trial Transcript at 185. The sixth prospective juror who indicated knowledge of the prior trial mentioned his "acceptance" of the first jury's verdict, and the seventh juror who indicated knowledge of the prior trial suggested that there was sentiment among his friends that the petitioner's retrial was because of a technicality.
>
> Evidence of a strong and pervasive community sentiment that the petitioner was guilty continued to surface in the voir dire testimony of subsequent prospective jurors. In light of this evidence of community prejudice, the publicity that surrounded petitioner's first trial, and the apparent feeling among some that the petitioner's retrial was a mere formality, the Court finds that there existed a substantial possibility of prejudice at petitioner's trial.

District Court Order dated June 30, 1986 at 15–17.

A thorough voir dire examination is perhaps the most important device to ensure that a jury is impartial. *See generally*

---

1. Berryhill contends that the poll was established to be reliable in its completed authentication and methodology. The state claims that the poll's results are questionable at best because of "unknown factors" and irrelevant questions.

*Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) ("*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."); *Pointer v. United States,* 151 U.S. 396, 408–09, 14 S.Ct. 410, 414–15, 38 L.Ed. 208 (1894) ("Any system for the impanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of [the right to exclude jurors through peremptory challenges] must be condemned; and therefore he cannot be compelled to make a peremptory challenge until he has been brought, face to face in the presence of the court, with each proposed juror, and examination of him as is required for the due administration of justice.").

Although the proper scope of voir dire is generally left to the sound discretion of the trial court, that discretion is not unfettered. Where there is a significant possibility of prejudice, the trial court must ensure that voir dire is sufficient to unearth potential prejudice in the jury pool. *Jordan v. Lippman,* 763 F.2d at 1274–1281; *United States v. Davis,* 583 F.2d 190, 196–98 (5th Cir.1978). Although these principles were first set forth in *Davis,* which was a direct appeal of a federal conviction, in *Jordan,* we made it clear that *Davis* and its progeny were fully applicable in the habeas corpus context because they relied upon "constitutional principles derived from Supreme Court jurisprudence ... enunciated in cases involving direct and habeas review of state court proceedings." 763 F.2d at 1278 n. 15. Consequently, a defendant is deprived of due process and his right to an impartial jury if the voir dire procedure is so limited that it cannot uncover prejudice. *Id.* at 1281.

We applied these principles in *United States v. Hawkins,* 658 F.2d 279 (5th Cir.

Unit A Sept. 1981), where the indictment of six defendants for racketeering and marijuana offenses generated a "significant amount of local coverage by the news media." *Id.* at 282.[2] As a result of the publicity, the defendants filed pretrial motions requesting examination of each prospective juror who had been exposed to the publicity. The district court denied the motions, and simply asked the prospective jurors collectively whether or not they had heard or read anything that had caused them to form an opinion as to the guilt or innocence of the defendants. No member of the panel responded affirmatively, but during voir dire, forty-eight of the fifty-six prospective jurors stated that they had heard or read something about the case. The defendants renewed their requests for individual examination of the prospective jurors, but the district court again denied their motions. *Id.* We reversed the defendants' convictions, holding that the district court's inquiry, given the extent of the pretrial publicity, was inadequate to reveal possible prejudice. *Id.* at 285; *see also Davis,* 583 F.2d at 196–98 (voir dire inadequate to unearth bias when trial judge merely asked jury members to raise hands if anyone felt publicity impaired his impartiality).

In this case the district court found that the manner in which the voir dire was conducted was insufficient to unearth the prejudice of the jury members:

> The voir dire in this case ... was conducted in the presence of all the prospective jurors. The inhibiting effect of a large audience and the tendency for potential jurors to incorporate other's voir dire testimony into their own made a careful and probing voir dire all the more important. Moreover the danger that potential jurors would be prejudiced by comments made by other potential jurors during voir dire made questioning a more delicate exercise. The examiner had to walk a fine line between unearthing bias for the purpose of exercising strikes and revealing bias that might infect the rest

---

**2.** The television and print media reported the defendants' names and the nature of the drug charges, and repeated the allegation that the defendants had been responsible for importing 170 tons of marijuana. *Id.* at 284.

of the prospective jurors. *See* Transcript of Federal Habeas Corpus Hearing at 21–22 (Jan. 17, 1986).

In this case, the problems inherent in questioning potential jurors in front of other potential jurors were not combatted by questions "calculated to elicit the disclosure of the existence of actual prejudice, the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the jurors' attitude towards the trial." *Coleman v. Kemp*, 778 F.2d 1487, 1542 (11th Cir.1985) (citing *Calley v. Callaway*, 519 F.2d 184, 208–09 (5th Cir.1975)). Indeed, in many instances questions aimed at these disclosures were foreclosed by the trial court's interjection of the statutory questions concerning the juror's ability to be impartial and fair. *See, e.g.*, Trial Transcript at 476–79.

The interjection of the statutory questions by the trial court also created a second and more insidious obstruction to obtaining an impartial jury. As Dr. Craig Haney, a psychologist, testified in the habeas corpus hearing in this Court, the trial judge is an authority figure in the courtroom. Psychological studies show that when people are questioned by authority figures, they become less candid and open. Transcript of Federal Habeas Corpus Hearing at 32 (Jan. 17, 1986). The voir dire transcript in this case reveals a pattern of increasingly less candid answers to counsel for the defendant in order to avoid questioning by the judge.

Considering only those jurors that indicated they knew about the prior trial, fewer and fewer admitted, as the voir dire progressed, to having had an opinion about petitioner's guilt. Of the first ten potential jurors that remembered the prior trial, only one stated that he had formed no opinion as to petitioner's guilt. Of the second ten potential jurors, five indicated that they had formed no opinion. Of the third ten potential jurors, six indicated that they had formed no opinion. Of the fourth ten potential jurors that remembered the prior trial, nine indicated that they had formed no opinion

as to petitioner's guilt. In this last group of ten, at least three potential jurors indicated that, while family or friends had formed opinions, they themselves had formed no opinion based on what they knew about the prior trial. District Court Order dated June 30, 1986 at 18–20 (footnote omitted).

As a result of the trial court's rulings, Berryhill's counsel was faced with a Hobson's choice. To ensure a fair jury, he had to question each prospective juror individually about what the juror knew about the case from the media or other exposure. By being forced to ask such pointed questions in front of the *entire* jury venire, however, Berryhill's counsel risked contaminating those prospective jurors who had not read or heard about the case with the responses of those who had. *See Coppedge v. United States*, 272 F.2d 504, 507–08 (D.C.Cir.1959) (had juror admitted before his fellow jurors that he was influenced because of a newspaper article which reported that prosecutor had stated that the defendant was a vicious criminal, that witness was deathly afraid of the defendant, and that district court did not believe that witness could be protected, "the damage to the defendant would have been spread to the listening other jurors"), *cert. denied*, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961).

The sequestered individual voir dire of jurors "is not unusual, nor viewed with suspicion." *In re Greensboro News Co.*, 727 F.2d 1320, 1323 (4th Cir.1984) (holding that newspapers were not entitled to a writ of mandamus challenging district court order providing for in camera voir dire of potential jurors in criminal prosecution since order was made to ensure frank and forthcoming responses and represented a proper balance between First Amendment concerns of news media and Sixth Amendment fair trial rights of the defendants). Indeed, the practice has been endorsed by the Judicial Conference of the United States and the American Bar Association. *See Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue*, 87 F.R.D. 519, 532–33 (1980);

ABA Standards for Criminal Justice, Fair Trial and Free Press, Standard 8–3.5; *see also Coleman,* 778 F.2d at 1542 (in "light of the significant possibility of prejudice, preferable voir dire procedures would have followed the ABA guidelines").

No court has held that an individualized segregated voir dire is constitutionally required. *Cf. Patton v. Yount,* 467 U.S. 1025, 1034 n. 10, 104 S.Ct. 2885, 2890 n. 10, 81 L.Ed.2d 847 (1984) (noting that individual sequestered voir dire, while not controlling, "is not an insubstantial" factor in the presumed prejudice analysis). For example, in *Reiger v. Christensen,* 789 F.2d 1425 (9th Cir.1986), the Ninth Circuit indicated that individual voir dire outside the presence of the other jurors was not constitutionally required, but recognized that Reiger's conviction would be reversed if the voir dire procedure used by the trial court involved " 'such a probability that prejudice will result that it is deemed inherently lacking in due process.' " *Id.* (quoting *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965)). Reiger had been convicted in Hawaii of rape, attempted murder, and first degree burglary. After the jury was empaneled, the trial court was informed that the jury had been exposed to adverse pretrial publicity regarding Reiger. Over defense counsel's objection, the trial court examined each juror individually in open court in the presence of the other jurors. One of the jurors was excused after she stated that she had heard about "Reiger's possible connection with the underworld." *Id.* at 1433. The Ninth Circuit held that the juror's comments "may have created a significant potential for prejudice," and remanded the case so that the district court could examine the state court transcripts to determine whether the other jurors' "assurances of impartiality were adequate to ensure Reiger a fair trial." *Id.* at 1434–35.

Affirming the district court on the issue of the inadequacy of the voir dire does not require a holding that an individual segregated voir dire is constitutionally required in cases of pretrial publicity. This case falls well within our caselaw which "requires, at the least, that where there exists a significant possibility of prejudice the jurors must in the first instance be questioned as to whether they were exposed. Further inquiry as to the nature of the exposure is then undertaken, if necessary." *Jordan,* 763 F.2d at 1283. In this case, the manner of voir dire was insufficient in light of the significant possibility of prejudice from the pretrial publicity to ensure Berryhill's right to an impartial jury and due process.

I conclude our panel should reach and affirm the district court's order granting the writ on the voir dire issue.